UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| 2/25/94 LLC and NEW ENGLAND PATRIOTS LLC,<br><br>　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>EASTERN AIRLINES, LLC,<br><br>　　　　　　Defendant. | Civil Action No. _____<br><br>**COMPLAINT** |

Plaintiffs 2/25/94 LLC ("2/25/94") and New England Patriots LLC (the "Patriots," together with 2/25/94, the "NEP Parties"), by their attorneys Paul, Weiss, Rifkind, Wharton & Garrison LLP, bring this action against defendant Eastern Airlines, LLC ("Eastern") and allege as follows:

## NATURE OF THE ACTION

1. This case is brought to remedy Eastern's indisputable and bad faith breach of its contractual obligations to provide air transportation services for the Patriots football team. Under the relevant agreements, 2/25/94 leased two Boeing 767 airplanes to Eastern to use for commercial and charter operations in exchange for Eastern's promise to make specified payments to 2/25/94 and to transport the Patriots to their NFL road games for a period of six NFL seasons.

2. In July 2023, halfway through the six-year contract, Eastern attempted to coerce the NEP Parties into renegotiating the parties' valid and binding contract by offering the Patriots an ultimatum: if the NEP Parties did not pay Eastern more than provided for in the parties' agreement, Eastern would simply walk away from the agreement, leaving the Patriots without an airplane operator on the eve of the upcoming NFL season, and with no plan in place to transport the Patriots' sizeable contingent of players, coaches, and other personnel across the country.

3. Eastern cited no contractual basis for its demand to renegotiate the terms of the parties' agreement; in fact, there is none. Eastern simply bet that, on the eve of the NFL season,

the NEP Parties would pay more rather than scramble to find a new air services provider. But Eastern bet wrong: the NEP Parties refused to reward Eastern for its failure to abide by the terms of the parties' contract and terminated the agreement as a result of Eastern's default in accordance with its terms.

4. The NEP Parties bring this action to recover the damages they have suffered and will suffer as a result of finding a substitute air services operator for the three seasons remaining in the parties' agreement. Those contractual damages are considerable—no less than $22.8 million. In addition, the attempt by Eastern to wring additional, unbargained-for compensation out of the NEP Parties that the contract did not allow constitutes commercial extortion under the Massachusetts Unfair and Deceptive Trade Practices Act, entitling the NEP Parties to double or treble damages and attorneys' fees, in order to compensate the NEP Parties for Eastern's willful disregard of its contractual obligations.

## THE PARTIES

5. Plaintiff 2/25/94 LLC is a limited liability company organized under the laws of Delaware with its principal place of business at One Patriot Place, Foxborough, Massachusetts 02035. The sole member of 2/25/94 is Kraft Group LLC, a Delaware limited liability company whose sole member is Kraft Enterprises LLC, a Delaware limited liability company whose members are: (1) Robert K. Kraft, a Massachusetts resident; (2) KPLP Inc., a Delaware corporation based in Massachusetts; (3) Kraft Patriots Inc., a Delaware corporation based in Massachusetts; (4) Kraft Family Inc., a Delaware corporation based in Massachusetts; (5) Kraft Holdings Trust, a Massachusetts business trust; and (6) family trusts held for the benefit of four members of the Kraft family—Robert K. Kraft, Jonathan A. Kraft, Joshua M. Kraft, and Daniel A. Kraft, all of whom are Massachusetts residents.

6. Plaintiff New England Patriots LLC is a limited liability company organized under

the laws of Delaware with its principal place of business at One Patriot Place, Foxborough, Massachusetts 02035. The sole member of New England Patriots LLC is Kraft Enterprises LLC, whose corporate structure is alleged above.

7. Upon information and belief, Defendant Eastern Airlines, LLC is a limited liability company organized under the laws of Nevada whose members are Bradley Helsten and Kenneth Woolley, both of whom are Utah residents.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000 exclusive of costs and interest.

9. This Court has personal jurisdiction over Eastern because it has consented by contract to be subject to the jurisdiction of this Court under Paragraph 13.2 of the Aircraft Dry Lease Agreement, Paragraph 15.2 of the Aircraft Management Agreement, and Paragraph 14(a) of the Private Carriage Agreement, which are the operative agreements that govern this dispute.

10. Venue in this District is proper because the parties designated the United States District Court for the Southern District of New York as a proper venue under Paragraph 13.2 of the Aircraft Dry Lease Agreement, Paragraph 15.2 of the Aircraft Management Agreement, and Paragraph 14(a) of the Private Carriage Agreement.

## SUBSTANTIVE ALLEGATIONS

**I.    Eastern's Air Transportation Contracts with the NEP Parties**

11. On June 29, 2020, Eastern entered into a contract with the NEP Parties to provide air transportation services to Patriots players, owners, coaches, and other related personnel during six NFL seasons, from 2020/2021 through 2025/2026. The parties memorialized their agreement in three separate but inter-related contracts.

12.     The Dry Lease Agreement.  In the June 29, 2020 aircraft dry lease agreement (the "Dry Lease Agreement," attached as **Exhibit A**), the parties agreed that 2/25/94 LLC, as the "Lessor," would lease two Boeing model 767-323ER aircraft bearing manufacturer's serial numbers 25193 and 25194 ("Aircraft 25193" and "Aircraft 25194," and together, the "Aircraft") to Eastern Airlines, LLC, as the "Air Carrier," under a "dry lease" agreement.

13.     In a "dry lease" arrangement, the lessor provides the aircraft to the air carrier without a crew.  The air carrier is responsible for providing the crew and assumes full operational control of every flight—including initiating, conducting, and terminating the flight.  The air carrier is also typically responsible for paying the costs for maintenance, crew members, insurance, and other operating costs.

14.     In the Dry Lease Agreement, 2/25/94 agreed to lease the Aircraft to Eastern subject to the Private Carriage Agreement (described further below), under which Eastern agreed with 2/25/94's affiliate, the Patriots, to use Aircraft 25193 to transport the Patriots football team and associated personnel to their road NFL games.  When the Aircraft were not in use for Patriots-related football games, the Dry Lease Agreement permitted Eastern to conduct scheduled (for Aircraft 25194) and chartered flight operations, and for Eastern to use and operate the Aircraft for third-party commercial flights.  In exchange, Eastern agreed to pay 2/25/94 rent as set forth in Schedule B—a nominal $10/year fixed rental fee, a rental fee per block hour that the Aircraft was operated for third-party flights over a certain monthly threshold and a referral fee —and Eastern further agreed to other responsibilities such as (i) to keep records for the Aircraft, (ii) to manage and facilitate all maintenance except that 2/25/94 will reimburse Eastern for all heavy maintenance, the replacement of engines, APU and landing gear and the accomplishment of all FAA airworthiness directives and manufacturer services bulletins, (iii) to supply an appropriate

flight crew, and (iv) to maintain appropriate licenses under the Federal Aviation Regulations of the Federal Aviation Administration.

15. The parties agreed that the term of the contract would run for six full NFL seasons, commencing as of delivery of the Aircraft in July 2020 and effective through February 21, 2026 (the "Term"). Section 2 provides that the contract may only be terminated prior to the natural expiration of the Term "by a non-defaulting party in accordance with Section 10 as a result of a default by the other party." It further provides that the Dry Lease Agreement automatically terminates upon the expiration or other termination of the Management Agreement (described further below) or the Private Carriage Agreement.

16. Section 10 provides the full set of circumstances under which a non-defaulting party may terminate the Dry Lease Agreement:

> This Agreement may be terminated upon written notice by either party not in default hereunder (the "Non-Defaulting Party") if (a) the other party shall fail to make any payment then due hereunder within 10 days of written notice from the Non-Defaulting Party that such payment is past due, (b) the other party shall fail or refuse to perform or observe any other material agreement or obligation of such party set forth in any of the Transaction Documents, subject to such party's ability to cure such breach in a commercially reasonable time as agreed in the relevant Transaction Document or (c) any representation or warranty of the other party set forth in this Agreement shall fail at any time to be true and correct, which failure, refusal, breach or default, if curable, shall not be cured within 10 Business Days after receipt by such party of written notice from the Non-Defaulting Party specifying such failure, refusal, breach or default, or (d) Lessee shall fail to maintain the Aircraft on its Air Carrier Certificate following Entry Into Service (including as a result of suspension of such Air Carrier Certificate). In addition, this Agreement may be terminated upon written notice by the Non-Defaulting Party if (e) the other party becomes insolvent or is unable to pay its debts in the ordinary course of business, (f) the other party makes an assignment for the benefit of its creditors, (g) a receiver, liquidator, custodian, trustee or the like is appointed for the other party or its property, or (h) the other party commences a voluntary case or consents to the entry of an order for relief in any involuntary case under any applicable bankruptcy or insolvency law.

17. None of the authorized grounds for termination by Eastern are applicable here, as

the NEP Parties have not: failed to make any payments due; failed or refused to perform any contractual services; made any untrue representations or warranties; and there are no insolvency, assignment, or bankruptcy concerns.

18. Section 13 of the Dry Lease Agreement provides that the agreement is governed by the laws of the State of New York, and that the parties consent to the jurisdiction and venue of the United States District Court for the Southern District of New York.

19. <u>The Management Agreement</u>. The Dry Lease Agreement refers and is subject to the June 29, 2020 aircraft management agreement (the "Management Agreement," attached as **Exhibit B**), by and between Eastern Airlines, LLC, as the "Manager," and 2/25/94, as the "Customer."

20. The Management Agreement sets forth Eastern's responsibilities to arrange for and supervise entry-into-service modifications of the Aircraft, as well as to provide professional management and maintenance supervision services for scheduled and on-demand air transportation for the Aircraft, subject to the terms of the Dry Lease Agreement and Private Carriage Agreement. These services include, for example, performing appropriate Aircraft repair and maintenance; maintaining adequately trained flight support personnel; recordkeeping, record storage, and other administrative services; and obtaining and maintaining appropriate insurance.

21. The Management Agreement includes substantively similar provisions to the Dry Lease Agreement with respect to the Term, the agreement that New York law governs any dispute, and the parties' consent to this Court's jurisdiction and venue in the U.S. District Court for the Southern District of New York.

22. <u>The Private Carriage Agreement</u>. Both the Dry Lease Agreement and the Management Agreement refer to the June 29, 2020 agreement between Eastern and the Patriots,

6

under which Eastern agreed to provide air charter transportation services to the Patriots for Patriots football-related purposes (the "Private Carriage Agreement," attached as **Exhibit C**, and together with the Dry Lease Agreement and the Management Agreement, the "Contracts").  In particular, Eastern agreed to make Aircraft 25913, as the "Primary Aircraft," exclusively available during the Term for all flights to transport the Patriots football team and/or associated personnel to and from all road pre-season, regular season, and post-season games as well as other related NEP Parties flights designated by NEP Parties executives (the "Patriots Flights").  Eastern further agreed that the "Owner shall be entitled to schedule the use of the Primary Aircraft for other such flights as it may request" ("Other Owner Flights").

23. Among its contractual responsibilities, Eastern agreed to provide the Patriot Flights using Aircraft 25913 at no charge excerpt for additional expenses in Section 3 related to fuel inflation, the cost of in-flight catering, excessive block hour mileage, and certain excise taxes and other costs.  Eastern further agreed to maintain and have ready at all times during scheduled Patriots Flights a standby "hot spare" aircraft in the event that Aircraft 25913 was unable to complete a Patriots Flight.

24. Eastern agreed that Aircraft 25913 would be "specially configured and equipped to accommodate V.I.P. executive passenger transportation and other persons with special travel requirements and will unless the Owner agrees otherwise be dedicated exclusively to the Patriots' and Owner's use," and the agreement further recognized that the "Patriots have a need for unique air transportation services that are not generally available in the air transportation marketplace."

25. The Private Carriage Agreement includes similar provisions to the Dry Lease Agreement and Management Agreement with respect to the Term, the agreement that New York law governs any dispute, and the parties' consent to this Court's jurisdiction and venue in the U.S.

District Court for the Southern District of New York.

26.     Section 12(a) of the Private Carriage Agreement authorizes the Patriots to unilaterally terminate the agreement upon, among other grounds, Eastern's failure to operate a Patriots Flight when scheduled or to adequately maintain the Aircraft in compliance with Federal Aviation Regulations.

27.     In contrast, the agreement only provides Eastern the right to terminate under limited circumstances: (1) under Section 12(c), if the "Patriots fails to pay all amounts past due," or (2) under Section 12(b), "(i) if the other party hereto breaches any material term or condition hereof, other than any listed in Section 12a, and such breach is not cured within ten (10) Business Days after the breaching party receives written notice thereof from the other party, or (ii) in the case of a default by the other party or its affiliate under any other agreement between them or their affiliate, such default has not been cured within the time prescribed therein and such other agreement."

28.     None of the authorized grounds for termination by Eastern in Section 12 are applicable here.  The Patriots have not failed to make any payments due or otherwise breached any material terms or conditions of the contract.

II.     **Eastern's Anticipatory Breach and Its Attempt to Extort a New Contract on the Eve of the 2023/2024 NFL Season**

29.     On July 7, 2023, Eastern's Executive Vice President of Commercial, Steve Kasteler, and its President and Chief Operating Officer, Brian Randow, sent a joint letter regarding Eastern's responsibilities under the Contracts to two executives of affiliates of the NEP Parties—Chief Financial Officer of the Kraft Group, Mike Quattromani, and Chief Operating Officer of Kraft Sports + Entertainment LLC, James J. Nolan.

30.     On information and belief, Eastern timed its letter to the NEP Parties to coincide with the upcoming commencement of the NFL season.  In particular, the Patriots' offseason

workouts began on April 17, their 10-day offseason organized team activity workouts ran from May 22 through June 9, and their three-day mini-camp lasted from June 12–14.  At the time of this letter, the Patriots' first pre-season game was little more than a month away, on August 10, 2023, and the Patriots' first scheduled flight was on August 15, 2023.

31.   In its July 7, 2023 letter, Eastern announced that it was "unable to honor that existing Dry Lease Agreement," and it attached a new proposed dry lease agreement whose economic terms were *significantly* more lucrative to Eastern and substantially more expensive to the NEP Parties.  Eastern then presented the NEP Parties with an ultimatum:  either agree to alter the parties' valid contract on terms more favorable to Eastern, or otherwise, "If this is unacceptable, [Eastern] will have no choice [but] to terminate the current contract."  Eastern recited no provision of the contract that would permit it to unilaterally change its economic terms, and it demanded a response within one week, by July 14, 2023.

32.   On the afternoon of July 14, before the close of business on the day of Eastern's deadline to its ultimatum, Eastern's president and COO, Brian Randow, sent a purported "Notice of Termination of Aircraft Dry Lease Agreement" to Messrs. Nolan and Quattromani, with a purported effective date as of July 14.  The letter states, "Please see below our notice of cancellation effective today of the existing agreement between Eastern Airlines and 2/25/94 LLC, Aircraft Dry Lease, and related agreements [i.e., the Management Agreement and Private Carriage Agreement] regarding the two Boeing 767-300's, N36NE and N225NE."

33.    Eastern claimed in its letter that "As we have stated for the past few months to you both, Eastern Airlines is not able to support an agreement of this kind."  But Eastern identified no unpaid invoices to support any unilateral termination right—indeed, its letter provided no contractual support for termination at all.  Instead, Eastern unilaterally claimed to have incurred

9

certain "costs without payment" that Eastern "do[es] not reap money for."

34. As of the date of the letter, there were fewer than five weeks before the Patriots' first NFL pre-season away game, leaving the Patriots' with an immediate need to find adequate alternative air transportation arrangements for the upcoming NFL season and beyond.

35. In the following business days, Eastern contacted the NEP Parties to see if its purported termination had sufficiently coerced the NEP Parties into acceding to the new terms that Eastern demanded.

36. On July 21, 2023, counsel for the NEP Parties advised Eastern that the Contracts "obligate[] Eastern to provide various air carrier services including, among other things, to fly the Patriots football team to the National Football League games it is scheduled to play beginning next month and throughout the 2023/2024 season and the succeeding two NFL seasons." The letter further communicated that Eastern had not provided "any contractual or other basis whatsoever for Eastern's 'cancellation' of, and refusal to perform under, the Agreement," and that Eastern's anticipatory breach of the Contracts violated Section 10.1(b) of the Dry Lease Agreement, Section 11.2 of the Management Agreement, and 12(a)(iv) of the Private Carriage Agreement.

37. That same day, Eastern sent a letter acknowledging the NEP Parties' July 21 letter, along with a separate letter in which it confirmed that it "will no longer be able to operate flights as previously occurred under the agreement with the Patriots, including the upcoming Patriots 2023-2024 away travel schedule."

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

38. The NEP Parties repeat and reallege each and every allegation previously alleged above as if fully set forth herein.

39. Eastern and 2/25/94 are parties to the Dry Lease Agreement and the Management

Agreement, and Eastern and the Patriots are parties to the Private Carriage Agreement.

40. The Contracts are valid, binding, and enforceable contracts governed by New York law.

41. The NEP Parties have performed all of the obligations, conditions, covenants, and promises required by them to be performed in accordance with the terms and conditions of the Contracts.

42. Eastern willfully and deliberately breached the Contracts when it advised the NEP Parties that it would no longer fulfill its contractual obligation to provide the air transportation services set forth in the Contracts. And, in fact, Eastern has ceased providing any such contractually obligated services.

43. The NEP Parties have suffered, and will continue to suffer, damages as a result of Eastern's breach of contract. As a consequence of Eastern's unequivocal anticipatory and actual breach of the Contracts, the Patriots have been required in exigent circumstances to contract with another air carrier to perform the flight operations set forth in the Contracts for the upcoming NFL season and the balance of the contractual term through February 2026.

44. Among other damages, the NEP Parties are entitled to more than $13.13 million dollars in estimated incremental travel costs to the NEP Parties: $4.21 million for the 2023/2024 NFL season, $4.35 million for the 2024/2025 NFL season, and $4.57 million for the 2025/2026 NFL season. These damages are directly caused by Eastern's willful breach of its obligations under the Contracts and could well increase if, for example, the Patriots play post-season road games, or if they are required to fly in two aircraft, as occasionally occurred during the course of the Contracts.

45. The NEP Parties are also entitled to more than $1.62 million in unrealized

reconfiguration and transition costs, which represent the actual costs incurred to reconfigure and transition the planes to Eastern in 2022 less the value received under the contract based on the contract months completed.

46. The NEP Parties are also entitled to $350,000 in damages arising out of payments that the NEP Parties will be forced to make to the Wi-Fi and in-flight entertainment vendors with whom Eastern contracted and whom, in light of Eastern's breach, the NEP Parties will likely need to pay to make whole.

47. The NEP Parties are also entitled to the nearly $3 million dollars that they will be forced to pay for the associated costs of maintaining the planes, including $1.60 million in ground maintenance and storage and $1.33 million in insurance.

48. Finally, the NEP Parties are entitled to damages in connection with their inability to use the Primary Aircraft for Other Owner Flights, which the Patriot's owner has previously used for both commercial purposes and *significant* humanitarian and charitable efforts—such as providing relief to Haiti, bringing healthcare workers to Super Bowls, and bringing KN95 face masks back from China to provide protection during the Covid-19 pandemic. In addition to substantial and unquantifiable reputational damage, the loss of use for the Other Owner Flights will directly cost the NEP Parties at least $4.85 million during the remainder of the Term.

49. In total, the NEP Parties are entitled to compensatory damages in excess of $22.8 million as well as pre-judgment and post-judgment interest required to make the NEP Parties whole as a result of Eastern's breach.

## SECOND CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

50. The NEP Parties repeat and reallege each and every allegation previously alleged above as if fully set forth herein.

51. The Contracts are governed by New York law. Under New York law, contracts have an implied covenant of good faith and fair dealing that prohibits a party from using its discretion in a way that is impliedly proscribed by the contract's express terms.

52. Through its anticipatory breach of the Contracts on the eve of the new NFL season, and its attempt to coerce the NEP Parties into accepting its illegal ultimatum, Eastern has breached its obligation of good faith and fair dealing.

53. The NEP Parties have suffered damages as a result of Eastern's breaches in an amount of not less than $22.8 million.

## THIRD CAUSE OF ACTION
### (Unfair and Deceptive Trade Practices under Massachusetts State Law)

54. The NEP Parties repeat and reallege each and every allegation previously alleged above as if fully set forth herein.

55. Plaintiffs 2/25/94 and the Patriots are "persons" for purposes of the Massachusetts Consumer Protection Law, as defined in M.G.L.A. 93A § 1(a).

56. Eastern's provision of air transportation services to the NEP Parties constitutes "trade" and "commerce" for purposes of the Massachusetts Consumer Protection Law, M.G.L.A. 93A § 1(b).

57. Eastern's deliberate breach of the Contracts on the eve of the new 2023/2024 NFL season, and its attempt to leverage this deliberate breach to extort the NEP Parties into entering a new contract, constitute unfair and deceptive acts or practices in violation of Massachusetts Consumer Protection Law, M.G.L.A. 93A § 2, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Massachusetts courts have interpreted the statute to preclude contracting parties from threatening breach or breaching contracts for the purpose of extracting compensation that the contract does not provide.

58.     On information and belief, Eastern's threat to terminate the Contracts and its refusal to perform in accordance therewith, on the eve of the 2023/2024 NFL season, was designed to extract compensation from the NEP Parties to which Eastern knew or should have known that it was not entitled to under the Contracts.

59.     Eastern's extortionate conduct directly and proximately injured the NEP Parties and constitutes a violation of M.G.L.A. 93A § 2.

60.     As the NEP Parties are based in Massachusetts and the Patriots Flights were scheduled to depart from Massachusetts, this extortionate conduct occurred primarily and substantially within Massachusetts for purposes of M.G.L.A. 93A § 11.

61.     Consequently, the NEP Parties are entitled to recover treble or other multiple damages, in an amount to be determined at trial, attorneys' fees, and other relief under M.G.L.A. 93A § 11 as the Court may determine to be just and proper under the circumstances of Eastern's conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, the NEP Parties demand judgment against Eastern as follows:

(a)     An award of actual damages resulting from Eastern's breach of contract, in an amount of no less than $22.8 million;

(b)     Multiple damages, attorneys' fees, and other relief as provided under M.G.L.A. 93A § 11;

(c)     An award of costs and expenses as provided by law, as well as any attorneys' fees as the Court may determine to award other than under M.G.L.A. 93A § 11;

(d)     An award of interest, including pre-judgment interest, on the foregoing sums; and

(e)     Such other, further, and/or different relief as the Court deems just and proper under the circumstances.

Dated: New York, New York
October 3, 2023

                    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

                    By:   */s/ Jay Cohen*
                           Jay Cohen (jaycohen@paulweiss.com)
                           Brette Tannenbaum (btannenbaum@paulweiss.com)
                           Daniel A. Negless (dnegless@paulweiss.com)

                    1285 Avenue of the Americas
                    New York, New York 10019-6064
                    Telephone:  (212) 373-3000
                    Facsimile:  (212) 757-3990

                    *Attorneys for Plaintiffs 2/25/94 LLC and New England Patriots LLC*