# Exhibit A

*Execution Version*

# AIRCRAFT DRY LEASE AGREEMENT

**THIS AIRCRAFT DRY LEASE AGREEMENT** (this **"Agreement"**) is entered into this *29* day of *JUNE*, 2020 by and between **2/25/94 LLC ("Lessor")**, a Delaware limited liability company having its principal place of business at One Patriot Place, Foxborough, MA 02035, and **Eastern Airlines, LLC ("Air Carrier")**, a Virginia limited liability company having its principal place of business at 550 East Swedesford Road, Suite 210, Wayne, PA 19087.

**WHEREAS,** Lessor is the sole owner of two Boeing model 767-323ER aircraft bearing manufacturer's serial numbers 25193 and 25194, more particularly described in Schedule A annexed hereto (each herein respectively **"Aircraft 25193"** or **"Aircraft 25194,"** or an **"Aircraft"** and collectively the **"Aircraft"**); and

**WHEREAS,** Air Carrier holds that certain air carrier operating certificate number 2DYA074Q issued by the Federal Aviation Administration (**"FAA"**) under Parts 119 and 121 of the Federal Aviation Regulations, Title 14 Code of Federal Regulations (the **"FAR"**), and is registered with the United States Department of Transportation (the **"DOT"**) as a certificated air carrier in commercial operations under Parts 200 through 298 of the FAR (such FAA and DOT certifications and authorizations herein collectively referred to as the **"Air Carrier Certificate"**); and

**WHEREAS,** the Aircraft are subject to an Aircraft Management Agreement of even date herewith between Air Carrier as manager and Lessor as customer (the **"Management Agreement"**); and

**WHEREAS,** Lessor and Air Carrier desire that Lessor dry lease the Aircraft to Air Carrier for operation by Air Carrier in its scheduled (with respect only to Aircraft 25194) and charter operations under the authority of the Air Carrier Certificate, in accordance with the terms and provisions herein; and

**WHEREAS,** during the term of this Agreement, the Aircraft will be subject to use by NEP LLC, a Related Party of Lessor, pursuant to a Private Carriage Agreement of even date herewith between Air Carrier as carrier and NEP LLC as customer (the **"Private Carriage Agreement"**);

**NOW THEREFORE,** in consideration of the foregoing and the mutual covenants, agreements, representations and warranties herein contained, Lessor and Air Carrier agree as follows:

1. **DRY LEASE OF AIRCRAFT.**

   1.1 **Dry Lease.** Subject to the terms and conditions herein, and during the Term (as defined below), Lessor hereby dry leases the Aircraft to Air Carrier, and Air Carrier hereby dry leases the Aircraft from Lessor, for the sole purpose of permitting Air Carrier to operate the Aircraft in commercial carriage. Such lease of the Aircraft shall be continuous and exclusive, subject to the

provisions of the Management Agreement. The parties hereto acknowledge that this Agreement is intended as a dry lease and shall not be construed in any manner to constitute a "wet" lease of the Aircraft.

## 2. TERM.

    2.1    **Commencement and Duration.** The lease of the Aircraft hereunder shall commence on the Delivery Date (as defined in Section 3 below) of the particular Aircraft and shall continue thereafter until February 21, 2026 (the **"Term"**) unless earlier terminated in accordance with the terms and provisions hereof. At the expiration of Term period, the Term as to each Aircraft may be renewed for additional periods of 24 months as may be agreed by the parties.

    2.2    **Early Termination.** This Agreement and the Term may be terminated prior to expiration of the Term by a non-defaulting party in accordance with Section 10 as a result of a default of the other party.

    2.3    **Automatic Termination.** This Agreement and the Term shall terminate automatically upon the expiration or other termination of the Management Agreement or Private Carriage Agreement.

## 3. DELIVERY AND REDELIVERY OF THE AIRCRAFT.

    3.1    **Inspection.** Lessor shall cause the Current Manager to make Aircraft 25193 available to Air Carrier at Airborne Maintenance & Engineering Services, Wilmington Ohio (KILN). and Aircraft 25194 available to Air Carrier at Citadel Completions, Chennault International Airport, Lake Charles, Louisiana, (provided that in either case, each such facility has the capability and capacity to accomplish on the Aircraft the EIS Modifications and related work necessary for such Aircraft to comply with the Delivery Conditions), each on a date mutually agreeable to the parties not later than [*], 2020. Upon such availability and following accomplishment of the EIS Modifications, Air Carrier shall have full opportunity to accomplish a technical inspection of each Aircraft to determine whether it complies with the Delivery Condition (defined in Schedule C annexed hereto), including a test flight of up to two hours' duration (such inspection including such test flight called herein the **"Delivery Inspection"**).

    3.2    **Acceptance and Delivery.** Within three Business Days after completion of the Delivery Inspection, Air Carrier shall execute and deliver to Lessor a technical acceptance certificate specifying any discrepancies found upon the Delivery Inspection. Air Carrier shall, at Lessor's expense, promptly correct any such discrepancies which cause the Aircraft not to comply with the Delivery Condition (**"Delivery Discrepancies"**). Once the Aircraft complies with the Delivery Condition, Air Carrier shall so indicate in such technical acceptance certificate, and within two Business Days thereafter, Air Carrier shall accept delivery of the Aircraft hereunder by executing and delivering to Lessor a Lease Supplement therefor in the form of Exhibit 1 annexed hereto

(the "**Delivery**") the date of such acceptance and delivery herein the "**Delivery Date**").  Air Carrier shall have no right to refuse Delivery of the Aircraft, other than Lessor's refusal to bear the costs of correcting the Delivery Discrepancies.

3.3     **Redelivery by Air Carrier.**  Upon expiration or other termination of the Term, Air Carrier shall redeliver each Aircraft to Lessor at mutually agreeable location on a date mutually agreeable to the parties.  Upon such redelivery, Lessor shall have the full opportunity to inspect the Aircraft to determine whether it complies with the Redelivery Condition (defined in <u>Schedule F</u> annexed hereto), including a test flight of up to two hours' duration (such inspection including such test flight called herein the **"Redelivery Inspection"**).

3.4     **Acceptance by Lessor.**  Within three Business Days after completion of the Redelivery Inspection, Lessor shall execute and deliver to Lessor a technical acceptance certificate specifying any discrepancies found upon the Redelivery Inspection.  Air Carrier shall promptly correct any such discrepancies which cause the Aircraft not to comply with the Redelivery Condition, the cost of such corrections to be paid as further provided in this Agreement or in the Management Agreement.   If the Aircraft complies with the Redelivery Condition, Lessor shall so indicate in the technical acceptance certificate and within two Business Days thereafter shall accept redelivery of the Aircraft hereunder by executing and delivering to Air Carrier a redelivery certificate.

4.  **OPERATIONS BY AIR CARRIER AND CERTIFICATION.**

4.1     **Licenses.**  Air Carrier represents that it is a duly authorized commercial airline business, holding and conforming in all respects to the Air Carrier Certificate and such other certificates or authorizations as may be required in order to perform Air Carrier's obligations under this Agreement and the Private Carriage Agreement and the regulations promulgated by the FAA and DOT.

4.2     **Air Carrier Flights.**  Use of the Aircraft by Air Carrier in scheduled (but only with respect to Aircraft 25194) or charter commercial operations under this Agreement (each single such use a **"Commercial Flight"**) shall be in accordance with FAR Part 121, <u>provided however</u> that Air Carrier may conduct in accordance with Part 91 of the FAR maintenance flights, training flights, ferry or positioning flights and other similar flights during which the Aircraft is not being operated in commercial operations (each such flight, unless otherwise provided herein, an **"Air Carrier Non-Commercial Flight"**).  Air Carrier shall operate all Commercial Flights and Air Carrier Non-Commercial Flights (collectively **"Air Carrier Flights"**) pursuant to this Agreement (a) in accordance with the requirements, authorizations, limitations and procedures of all applicable FARs including FAR Parts 91 and 121, (b) in accordance with the manufacturer's and Air Carrier maintenance and operations, in each case as approved and accepted by the FAA and the Air Carrier Certificate and related operations specifications, (c) in accordance with

3

the terms of the applicable policies of insurance, and (d) in compliance with all other laws and regulations applicable to the operation, use, safety and maintenance of the Aircraft by Air Carrier.

4.3     **Operational Control of Air Carrier Flights.** Air Carrier shall have and maintain sole and exclusive **"Operational Control"** (as defined in § 1.1 of the FAR as such may be amended, modified or superseded from time to time) of the Aircraft at all times when Air Carrier is operating Air Carrier Flights under this Agreement.  Specifically, without limitation, Air Carrier is responsible for ensuring that all flight and cabin crew operating the Aircraft under the Air Carrier Certificate have received the required training and that the Aircraft is insured for all operations of the Aircraft conducted under the Air Carrier Certificate.  At no time during any Air Carrier Flight (including pre-flight) will any person or entity other than authorized Air Carrier personnel, which for the avoidance of doubt shall include John Gaff (if then employed by Air Carrier) have any control whatsoever over such Air Carrier Flight.  During each Air Carrier Flight, Air Carrier shall have sole responsibility for (a) deciding whether or not to initiate the Air Carrier Flight, (b) assigning the Flight Crew (defined in Section 9.1), and (c) making all decisions related to Operational Control.  Prior to initiating any Commercial Flight, Air Carrier shall make all passengers aware that the Commercial Flight is being operating by Air Carrier exclusively.

4.4     **Certification and Conformity Check.** The allocation of costs to accomplish the certification and conformity checks of the Aircraft and placement of the Aircraft on the Air Carrier Certificate is set forth in the Management Agreement.  Notwithstanding any provision in the Transaction Documents, Air Carrier reserves the right to remove the Aircraft or any personnel from its Air Carrier Certificate if and when the Aircraft or such personnel do not meet the requirements of the applicable FARs, Air Carrier policies and procedures, the FAA, or any other applicable regulatory authority's rules and regulations at any time.

## 5.  OPERATIONS FOR LESSOR AND AFFILIATES OR LESSEE(S)

5.1     **Other Lessor Flights.** If requested by Lessor and not already subject to the Private Carriage Agreement, Air Carrier shall provide Flight Crew and cabin crew and pay operating costs for other Lessor Flights in return for full reimbursement of Air Carrier's direct variable cost to conduct such flights (including without limitation travel and incidental costs for crew and fuel) plus fifteen percent (15%).  All such flights shall be excluded from the allotted flight hours and related calculations set forth in the Private Carriage Agreement.

## 6. REVENUE COMMERCIAL FLIGHTS AND SCHEDULING.

6.1     **Use By Air Carrier.**   When not operating Patriots Flights, Air Carrier may use and operate the Aircraft for such revenue Commercial Flight purposes as Air Carrier deems the Aircraft suitable ("**Third Party Flights**"), provided that Air Carrier shall not use Aircraft 25193 for Third Party Flights unless prior to using Aircraft 25193, (i) Aircraft 25194 is not available, and (ii) Lessor has approved the use of Aircraft 25193 in writing.

6.2     **Flight Revenues.**   Subject to Section 6.3 below, all revenue earned by Air Carrier in connection with Aircraft Third Party Flight activities during the first three years of the term hereof shall be solely for Air Carrier's account.   Air Carrier shall be responsible for all costs, expenses, fees and associated taxes in respect of such Third Party Flights.   After expiration of such three year period, Air Carrier shall pay to Lessor $250 per block hour for each block hour operated in excess of 300 block hours in any month for each Aircraft.

6.3     **Lessor Promotion of Third Party Flights.**   If Lessor refers a customer to Air Carrier ("**Lessor Referral**"), for a period of one year following such referral, the revenue paid by such customer for all flights by it shall be allocated as follows:

(a)     First, to Air Carrier to pay for the direct operating costs of the referred flight; and

(b)     Second, an amount equal to 80% of the remaining net revenue (herein the "**Referral Fee**") to Air Carrier and an amount equal to 20% thereof to Lessor, respectively.

Lessor shall not charge or receive any consideration in exchange for Third Party Flights other than the Referral Fee (if any), the amounts described in Section 6.2 above and the Rent (as defined in Section 8.1 below) for the use of the Aircraft by Air Carrier as provided herein.   Lessor shall not solicit, advertise or market the Aircraft for revenue operations, unless such solicitation, advertising and marketing (a) are in accordance with marketing materials pre-approved in writing by Air Carrier and clearly and conspicuously state: "All revenue flights are operated by Eastern Airlines, LLC, an air carrier licensed by the FAA and registered with the U.S. Department of Transportation," (b) are fully consistent with guidance material issued by the DOT, including but not limited to the DOT air carrier broker regulations contained in FAR Part 295, and (c) otherwise in accordance with applicable law ("**Advertising**").   Air Carrier hereby appoints Lessor as an agent for finding customers for Air Carrier's air charter Commercial Flights. Lessor covenants and agrees that neither Lessor nor any person or entity acting on behalf of Lessor shall hold itself out as providing or operating Commercial Flights.

5

6.4    **Lessor Failure to Provide Aircraft for a Third Party Flight.** If Lessor fails or refuses to make the Aircraft, other than Aircraft 25193 which Owner may refuse to make available for any reason or no reason (unless previously approved in writing), timely available to Air Carrier for a Third Party Flight that does not conflict with any pre-scheduled Patriots Flight, Lessor shall reimburse Air Carrier for costs incurred by Air Carrier in connection with the cancellation of such Third Party Flight, including without limitation any documented additional expenses of Air Carrier in procuring a substitute Aircraft for such approved Third Party Flight(s) such as additional ferry time or a higher buy rate for a similar aircraft in order to provide alternative lift for the Third Party Flight. Air Carrier shall use commercially reasonable efforts to mitigate and minimize the amount of such additional expenses.

6.5    **Cancellation of a Commercial Flight by Charter Customer.** If Air Carrier schedules a single-entity charter for a Commercial Flight that does not conflict with any Patriots Flight, Air Carrier shall decline requests from others to reserve the aircraft for the same period. If the customer for a single-entity charter cancels any trip or part of such trip with less than 24 hours prior notice to Air Carrier, Air Carrier nonetheless may invoice the charter customer (i) any amount which may be due by reason of partial completion of the original itinerary, including positioning, and (ii) an amount equal to the hourly rate specified in the original approval multiplied by two. Air Carrier reserves the right to negotiate cancellation fees with a charter customer arising from unforeseen situations such as weather, passenger health issues, accident, etc. If in the course of conducting a charter for a charter customer Air Carrier receives or is entitled to receive an economic benefit from a second charter customer for any flight or portion of any flight of the Aircraft operated for the first charter customer, such economic benefit.

## 7. MAINTENANCE AND RECORDS.

7.1    **Air Carrier Maintenance Responsibilities.** Following the bridging of each Aircraft to Air Carrier's maintenance program pursuant to the Management Agreement and the acceptance by Air Carrier of the Aircraft hereunder, Air Carrier shall add the Aircraft to Air Carrier's Air Carrier Certificate. At all times after the Aircraft has been placed on Air Carrier's Air Carrier Certificate, Air Carrier shall ensure that the Aircraft is continuously maintained in accordance with FAR Part 121 standards, the Air Carrier's Continuous Airworthiness Maintenance Program, FAA approved and accepted manuals and all other Air Carrier maintenance requirements as approved or required by the FAA for Air Carrier's operation of Commercial Flights and continued qualification for remaining on the Air Carrier's Air Carrier Certificate. While the Aircraft is on Air Carrier's Air Carrier Certificate, Air Carrier is solely responsible for performing or directing to be performed all of the Aircraft's maintenance, preventative maintenance, repairs and alterations.

7.2    **Letter Checks.** Air Carrier will manage and facilitate the accomplishment of all scheduled and unscheduled heavy maintenance and inspections ("**Letter**

Checks") for the Aircraft; provided that Lessor shall pay directly (or at Air Carrier's option, reimburse Air Carrier) for the direct cost, including any applicable taxes for parts and labor (without Air Carrier markups), to accomplish all such heavy maintenance and inspections, including without limitation third-party labor, materials, Aircraft relocation and related incidental costs and expenses. The Lessor shall, upon reasonable prior notice and during regular Business Day working hours and without disruption to Air Carrier's business or operations, have the right to audit the records of such Letter Checks, and dispute any non-routine repairs charged to Lessor in excess of $100,000, in the aggregate that have been accomplished during the Letter Check and to the extent which the same are attributable to Air Carrier's gross negligence or willful misconduct in the course of Air Carrier's performance of Line Maintenance or Air Carrier's failure to adhere to the express requirements set forth in the applicable approved/accepted data from the OEM or the Air Carrier's Continuous Airworthiness Maintenance Program as the same relate to the disputed items only.

7.3 **Line Maintenance.**    Air Carrier will manage and facilitate the accomplishment of all scheduled, unscheduled and line maintenance and inspections (other than Letter Checks) for the Aircraft ("**Line Maintenance**"). Air Carrier will pay the direct cost to accomplish all such Line Maintenance, including without limitation third-party labor, materials, aircraft relocation, related incidental costs, and any applicable taxes on parts and labor, with Lessor to pay for all costs to accomplish all other maintenance including, without limitation, off-wing and/or shop visit maintenance of the Engines, APUs and Landing Gear.  All Line Maintenance shall be promptly conducted as it becomes due, without deferrals, in order to avoid service disruptions. Line Maintenance may be deferred, with notice to Lessor, when such deferral (i) will not affect safety of flight, (ii) is permitted by the Air Carrier's Operations Specifications, and (iii) is scheduled to be completed at the next available time, which does not affect the flight schedule.  If such next available time coincides with a Letter Check, such Line Maintenance items shall be for the account of the Air Carrier.

7.4 **Airworthiness Directives and Service Bulletins**.  Air Carrier will manage and facilitate the accomplishment of all FAA airworthiness directives ("**ADs**") and manufacturer service bulletins ("**SBs**") issued and applicable to the Aircraft; provided that Lessor shall pay directly (or at Air Carrier's option, reimburse Air Carrier) for the direct cost (without Air Carrier markups) to accomplish all such ADs and SBs.  For ADs that only require inspection, and provided such inspection may be accomplished by Air Carrier's employees without having to disassemble the Aircraft (other than the opening of quick access panels, bay doors or borescope ports), Air Carrier will conduct such inspections at no cost to Lessor.

7.5 **Engines; APU; Landing Gear**.  Should any of the foregoing maintenance activities require the replacement (either on a temporary or permanent basis) of any engine, auxiliary power unit or landing gear, Lessor will promptly

provide a replacement item from its inventory or Air Carrier will, in coordination with Lessor, facilitate the replacement (by lease or purchase) of the same at Lessor's cost and expense (provided that Air Carrier shall bear any premium charges, including without limitation priority parts availability and acquisition, extraordinary labor costs, and any additional tax, fees, and expenses as result of such work, incurred to meet the flight schedule for non-Patriots Flights) in order to minimize disruption to the continuing operation and availability of the Aircraft for flight operations,.

7.6  **Aircraft Records.**  Air Carrier shall maintain at the location of its Air Carrier Certificate copies of all records for the Aircraft necessary to comply with the requirements of the Air Carrier's Air Carrier Certificate and all other Operational Control and regulatory requirements applicable to Air Carrier and Air Carrier Flights.  Upon the termination of this Agreement, all Air Carrier proprietary certificate documentation in the possession or control of Lessor (if any) will be returned to Air Carrier, to include but not be limited to the General Operating Manual and General Maintenance Manual, Minimum Equipment List, all unused portions of the Air Carrier Part 121 Aircraft Maintenance Flight Log, unused ferry authorizations, unused deferred item pages, and all other Air Carrier forms.  It is understood that these items are proprietary and may not be copied or reproduced without Air Carrier approval. Upon the termination of this Agreement, all other maintenance and operational records, manuals and logs specifically relating to the Aircraft not otherwise in the possession or control of Lessor shall be transferred to Lessor, provided that Air Carrier may retain copies of any such documentation as required by law or determined reasonably appropriate by Air Carrier.  Air Carrier shall maintain and make available to Lessor all records required under applicable laws and regulations and this Agreement in connection with the maintenance and operation of the Aircraft under Air Carrier's FAA-approved maintenance program.  Air Carrier shall provide Lessor duplicate copies of such records as the same are reasonably requested by Lessor not more than semi-annually.

7.7  **Lessor Registration and Maintenance Responsibilities.**  Lessor shall at its cost and expense maintain the valid registration of each Aircraft as a civil aircraft on the FAA Civil Aviation Registry at all times hereunder and shall cause this Agreement to filed and registered, as applicable with the FAA and the International Registry.  While the Aircraft is on the Air Carrier's Air Carrier Certificate, Lessor shall not perform or permit any person or entity other than Air Carrier (or those under the direction or control of Air Carrier) to perform any maintenance, preventative maintenance, repairs or alterations on or to the Aircraft.  Lessor agrees that while the Aircraft is on the Air Carrier's Air Carrier Certificate, the Air Carrier has the sole and exclusive responsibility, authority and control over maintenance of the Aircraft and will be provided sufficient possession and access to the Aircraft in order for the Air Carrier to ensure that the Aircraft is continuously maintained in accordance with FAR Part 121 standards and the Air Carrier's Continuous Airworthiness Maintenance Program and FAA approved and accepted manuals and all other

8

Air Carrier maintenance requirements as approved or required by the FAA for the Air Carrier's operation of Commercial Flights and continued qualification for remaining on the Air Carrier's Air Carrier Certificate.

7.8 **Lessor's Breach of Section 7.7.** If Lessor requests or instructs or any person or entity other than Air Carrier (or those under the direction or control of Air Carrier) to perform any maintenance, preventative maintenance, repairs and alterations on or to the Aircraft in violation of Section 7.7, and in response to such request or instruction the same are performed, Air Carrier may immediately suspend the Aircraft from use for any Air Carrier Flights and may, after notice to Lessor, prepare Operations Specifications to initiate the removal of the Aircraft from the Air Carrier's Air Carrier Certificate. Upon removal of the Aircraft from the Air Carrier's Air Carrier Certificate, Air Carrier may either (a) terminate this Agreement or (b) undertake actions necessary to place the Aircraft on the Air Carrier's Air Carrier Certificate. The fees related to the actions necessary to place the Aircraft onto the Air Carrier's Air Carrier Certificate will be charged, actual documented expenses and labor, to the Lessor.

## 8. RENTAL AND OTHER CHARGES AND EXPENSES

8.1 **Rent.** In consideration of the dry leasing of the Aircraft by Lessor to Air Carrier hereunder, Air Carrier shall pay to Lessor rent **("Rent")** in the amounts set forth in and as provided in Schedule B attached hereto.

8.2 **Operating Costs.** Except as otherwise provided in this Agreement and/or the Management Agreement, Air Carrier shall be responsible for and shall pay or reimburse Lessor, as applicable, all costs of operation of the Aircraft. All other trip-related incidental expenses attributable to Commercial Flights shall be the responsibility of either Air Carrier or its single entity charter customer, including, specifically, landing fees, customs, catering and additional or supplemental crew, and other crew expenses relating to lodging, transportation and meals. Air Carrier shall have all right and entitlement to file for any and all Federal Transportation Excise Tax refunds or credits, as the case may be, applicable to all fuel purchased and used for Commercial Flights. In furtherance thereof, Lessor agrees that it will not file for a refund of such taxes, if applicable.

8.3 **Billing and Payment from Air Carrier's Customers.** Air Carrier shall be solely responsible for billing and obtaining payment from Air Carrier's customers for all Commercial Flights.

8.4 **Tax on Commercial Flights.** Air Carrier shall collect and remit all excise taxes imposed by any governmental authority upon customer payments in connection with any Commercial Flights of the Aircraft.

8.5 **Aircraft and Lessor Taxes.** Lessor shall be solely responsible for reporting (including preparation and timely filing of all necessary or advisable returns)

and remitting payment of, and shall defend, indemnify and hold harmless Air Carrier from and against, any and all sales, use, transfer, ad valorem, property and other taxes, and all other governmental fees and charges, to the extent related to or arising out of the ownership, lease, possession, or registration of the Aircraft; excluding only excise taxes on Third Party Flights referenced in Section 8.4 above, which shall be collected and remitted by Air Carrier, and income taxes based upon the net income of Air Carrier.  All taxes due and payable in respect of Lessor Flights (including without limitation excise taxes) shall be the responsibility of Lessor, whether Air Carrier has the obligation to pay such taxes directly or to collect and remit such taxes on behalf of Lessor. In all cases in respect of the foregoing, the parties shall cooperate so as to mitigate lawfully the imposition of taxes on the transactions contemplated by the Transaction Documents.

8.6     **Monthly Statements of Operations.**  Air Carrier shall provide to Lessor a monthly statement of operations setting forth the Aircraft's Commercial Flight and Air Carrier Non-Commercial Flight hours, a breakdown of Lessor costs incurred by Air Carrier on behalf of Lessor, and all other amounts due to and from Lessor and Air Carrier in relation to the Aircraft and the use and operation by Air Carrier for the preceding calendar month.  All amounts shall be due and payable upon receipt of such monthly statement.

## 9.  STAFFING

9.1     **Flight Crews.** Air Carrier shall provide and be solely responsible for selection as well as the actions and inactions of Flight Crews (defined below) for all Air Carrier Flights.  Lessor may not direct which Flight Crew Air Carrier shall utilize to pilot the Aircraft for Air Carrier Flights.  All Flight Crews utilized for Air Carrier Flights shall be:

(a)     either direct employees of Air Carrier or agents of Air Carrier during every aspect of Air Carrier Flights, including those aspects related to any pre- flight and post-flight duties (it being understood that non-employee pilots shall be engaged by Air Carrier pursuant to written contract); and

(b)     currently trained and/or tested, qualified, and holders of the appropriate airman and medical certificates to conduct Air Carrier Flights, and otherwise qualified to accept the specific flight assignment, considering flight and rest requirements, airspace qualification and the type of operation intended in the assignment.

## 10. TERMINATION

10.1    This Agreement may be terminated upon written notice by either party not in default hereunder (the "**Non-Defaulting Party**") if (a) the other party shall fail to make any payment then due hereunder within 10 days of written notice from the Non-Defaulting Party that such payment is past due, (b) the other party shall fail or refuse to perform or observe any other material agreement or obligation of such party set forth in any of the Transaction Documents, subject to such party's ability to cure such breach in a commercially reasonable time as agreed in the relevant Transaction Document or (c) any representation or warranty of the other party set forth in this Agreement shall fail at any time to be true and correct, which failure, refusal, breach or default, if curable, shall not be cured within 10 Business Days after receipt by such party of written notice from the Non-Defaulting Party specifying such failure, refusal, breach or default, or (d) Lessee shall fail to maintain the Aircraft on its Air Carrier Certificate following Entry Into Service (including as a result of suspension of such Air Carrier Certificate). In addition, this Agreement may be terminated upon written notice by the Non-Defaulting Party if (e) the other party becomes insolvent or is unable to pay its debts in the ordinary course of business, (f) the other party makes an assignment for the benefit of its creditors, (g) a receiver, liquidator, custodian, trustee or the like is appointed for the other party or its property, or (h) the other party commences a voluntary case or consents to the entry of an order for relief in any involuntary case under any applicable bankruptcy or insolvency law.

## 11. POST-TERMINATION  RESTRICTIONS AND CONFIDENTIALITY

11.1    **Post-Termination Restrictions.** Lessor shall not, for a period of two years after any termination or expiration of this Agreement, directly or indirectly disclose the identities of charter clients of Air Carrier or its affiliates or directly or indirectly solicit charter business from clients of Air Carrier who have chartered the Aircraft during the term of this Agreement; provided, however, that such restriction shall not apply to any Lessor Referrals or Lessor Related Party. Lessor agrees that in the event of any failure or refusal by Lessor to fully and strictly comply with the provisions of this Section 11.1, Air Carrier may at its option seek and obtain injunctive relief..

11.2    **Confidentiality.** The terms of this Agreement, and the Schedules and Exhibits, and any information gained through its negotiation or performance, are considered confidential information by Air Carrier and Lessor, who hereby acknowledge that each has gained and will gain sensitive information about the business of the other in the course of this Agreement and will protect that information as it would its own. Any disclosure by one party of the other's confidential information is a material breach and grounds for termination as well as the exercise of any remedy at law or equity available to either party.

The provisions of Sections 11.1 and 11.2 shall survive any termination of this Agreement.

## 12. **EVENT OF LOSS; RISK OF LOSS**

12.1  **Notification of Event of Loss.**  If any damage to, destruction of or total or partial loss of the Aircraft (including without limitation any loss resulting from the theft, condemnation, confiscation or seizure of, or requisition of title to or use of the Aircraft) shall have occurred whether by private persons or any governmental or purported governmental authority, Air Carrier shall immediately:

(a)  report the event of loss to Lessor, the insurance company or companies, and any and all applicable governmental agencies; and

(b)  in coordination with the Lessor, furnish such information and execute such documents as may be required and necessary to collect the proceeds from any insurance policies.

12.2  **Repair or Termination.**  If the Aircraft is partially destroyed or damaged, Lessor shall have the option, in its sole discretion, to either (i) fully repair the Aircraft in order that it shall be placed in at least as good condition as it was prior to such partial destruction or damage; or (ii) terminate this Agreement. Within fifteen (15) days after the date of such partial destruction or damage, Lessor shall give written notice to Air Carrier specifying whether Lessor has elected to fully repair the Aircraft or to terminate this Agreement, which termination shall be effective immediately upon such written notice from Lessor to Air Carrier setting forth Lessor's election to so terminate this Agreement.

12.3  **Risk of Loss; Insurance.**  Air Carrier shall bear the risk of loss of the Aircraft and the same shall be insured in accordance with the Management Agreement.

## 13. **MISCELLANEOUS**

13.1  **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, exclusive of its choice of law provisions.

13.2  **Jurisdiction and Venue**.  For any dispute hereunder that is not resolved by negotiation between the parties' representatives, the parties hereto consent to the jurisdiction and venue of the United States District Court for the Southern District of New York where the matter in controversy meets the jurisdictional threshold requisites, or the appropriate court of the State of New York, County of New York, where federal jurisdiction is not satisfied.

13.3  **Jury Waiver**.  THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVE THEIR RIGHTS TO A JURY TRIAL IN ANY ACTION, SUIT, OR PROCEEDING RELATING TO, ARISING UNDER, OR IN CONNECTION WITH THIS AGREEMENT AND ANY

OTHER DOCUMENT, AGREEMENT, OR INSTRUMENT EXECUTED AND DELIVERED IN CONNECTION WITH THE FOREGOING.

13.4    **Severability**.  The invalidity or unenforceability of any term or provision of this Agreement shall not affect the validity or enforceability of any other term or provision hereof.

13.5    **Addresses for Notices**.  Notification under this Agreement will be made by email, facsimile (with confirmation of transmission) or overnight delivery service to the addresses specified below (or such other address as may be provided to the other party in writing from time to time):

If to Air Carrier:

Eastern Airlines, LLC
550 East Swedesford Road, Suite 210
Wayne, PA 19087
Attn:  Ken Johnson
Email:
kjohnson@goeasternair.com

If to Lessor:

2/25/94 LLC
One Patriot Place
Foxborough, MA 02035
Attn:  General Counsel
Email: jimc@ifpcorp.com

13.6    **Entire Agreement; Amendment**.  This Agreement, together with the other Transaction Documents, constitutes the entire understanding of the parties hereto with respect to the subject matter hereof.  This Agreement may be amended only by a written instrument duly executed by an authorized representative of the parties hereto or their respective permitted assigns.

13.7    **Non-Assignment**.  Neither Lessor nor Air Carrier may assign this Agreement, in whole or in part, without the prior written consent of the other, which will not be unreasonably withheld or delayed; provided that the consent of Air Carrier shall not be required for the assignment of this Agreement to a successor of Lessor which is an affiliate of Lessor or to a party financing the Aircraft for Lessor.

13.8    **Professional Advice**.  Each of the parties hereto represents to the other party that it has been represented by legal counsel in connection with the negotiation and execution of this Agreement.  In addition, each of the parties hereto represents that it has retained its own tax advisor and is not relying in any way on the other party for tax advice.

13.9    **Non-Waiver**.  The delay or omission in the exercise or enforcement of any right or remedy by either party shall not be construed as a waiver of such right or remedy.

13.10    **Covenant of Quiet Enjoyment:**  Subject to the exercise of Lessor's rights under this Agreement and the Management Agreement, Lessor covenants that

neither Lessor nor any person lawfully claiming by, through or under Lessor will interfere with or otherwise disturb Air Carrier's quiet, peaceful use and enjoyment of the Aircraft in accordance with the terms of this Agreement. The use of the Aircraft for marketing purposes by Owner that does not interrupt any scheduled use of the Aircraft shall not be considered a breach of the foregoing covenant of quiet enjoyment.

13.11 **Transaction Expenses**.  Except as otherwise set forth in this Agreement or the other Transaction Documents, each of Lessor and Air Carrier shall bear its own respective costs and expenses, including costs of counsel, in negotiating and documenting the transactions contemplated hereby.  Lessor shall pay for costs of FAA counsel in respect of the filing and registration of any Transaction Documents at the FAA Registry and the International Registry.

13.12 **Financing.**  Lessor may from time to time, at its sole option, pledge either or both Aircraft as collateral in connection with any financing arrangement it determines to be desirable.  In connection with the foregoing, Lessee agrees to execute such documents reasonably requested by the financial institution and Lessor shall promptly reimburse Lessee's costs, including attorney's fees, incurred in connection with the same.  Any such pledge or other financing arrangement shall not increase Lessee's costs or obligations nor diminish its rights under this Agreement, the Management Agreement or the Private Carriage Agreement and Lessor shall cause any financier to covenant Lessee's rights of continuing quiet enjoyment of the Aircraft as provided in Section 13.10.

13.13 **Aircraft Livery.**  Lessor may request that Air Carrier agree, at Lessor's sole cost, to modify the livery of either Aircraft during the term of this Agreement and Air Carrier shall cooperate with Lessor in connection with the same, provided that any such modification of livery (i) does not disrupt, delay or impede Air Carrier's use, operation, maintenance or scheduling of the Aircraft, (ii) is scheduled to be accomplished in conjunction with Aircraft down-time for maintenance, and (iii) with respect to Aircraft 25194, does not, in Air Carrier's good faith opinion, conflict with Air Carrier's business interests, reputation or other commercial agreements or arrangements.

13.14 **Section Headings**.  The section headings in this Agreement are inserted only for convenience and do not affect the interpretation hereof.

13.15 **Execution; Counterparts**.  A facsimile or electronically transmitted copy of an original signature to this Agreement shall be considered the same and effective as an executed original, and this Agreement may be executed in duplicate counterparts, each of which when fully signed shall constitute one and the same executed Agreement.  Air Carrier agrees to provide a manually executed or digitally executed original to the Lessor for the purpose of recording this Agreement with the FAA.

14. **DEFINED TERMS.**

The capitalized terms used herein have the meanings set forth in <u>Schedule C</u> annexed hereto.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** the parties hereto have caused this Aircraft Dry Lease Agreement to be executed and delivered by their respective, duly authorized representatives as of the date first above written.

**EASTERN AIRLINES, LLC, as Air Carrier**　　　**2/25/94 LLC, as Lessor**

By: _____　　　By: _____

Name: Steve Harfst　　　　　　　　　　Name:

Title:  President & CEO　　　　　　　　Title:

15

**IN WITNESS WHEREOF,** the parties hereto have caused this Aircraft Dry Lease Agreement to be executed and delivered by their respective, duly authorized representatives as of the date first above written.


**EASTERN AIRLINES, LLC, as Air Carrier**     **2/25/94 LLC, as Lessor**


By: _____     By: _____
Name:                                              Name:  *JAMES NOLAN*
Title:                                                Title:  *COO*

SCHEDULE A
To Aircraft Dry Lease Agreement


Aircraft Descriptions



Airframe Manufacturer and Model:       Boeing model 767-232ER[1]

Airframe Serial Number:                25193

U.S. Registration Mark:                N36NE

Registered Owner of the Airframe:      2/25/94, LLC

Engine Manufacturer and Model:         General Electric CF6[80C2][2]

Engine Serial Numbers:                 690360 and 690368




Airframe Manufacturer and Model:       Boeing model 767-232ER[3]

Airframe Serial Number:                25194

U.S. Registration Mark:                N225NE

Registered Owner of the Airframe:      2/25/94, LLC

Engine Manufacturer and Model:         General Electric CF6[80C2][4]

Engine Serial Numbers:                 690252 and 690321


Each Engine is rated at greater than 1,750 pounds of thrust or the equivalent thereof.

---

[1] Described on the International Registry Manufacturers' List as _____
[2]
[3]
[4]

SCHEDULE B
To Aircraft Dry Lease Agreement

*[NOTE:  THE TERMS OF THIS SCHEDULE B ARE CONFIDENTIAL AND CONTAIN COMMERCIALLY SENSITIVE INFORMATION; THIS SCHEDULE B MUST BE REMOVED FROM ANY PUBLIC FILING OF THIS LEASE]*

General Financial Terms

1.  **Certification and Conformity Expenses:**

The Aircraft certification and conformity inspection process includes records review and physical inspection of the Aircraft to meet the requirements of FAR Part 121 and Air Carrier's Air Carrier Certificate relating to the maintenance, equipment and condition of the Aircraft.  This inspection contemplates a customary Aircraft records review and preparation, and potential records reconstruction arising from inaccurate, missing, deficient or otherwise poorly maintained Aircraft records that do not satisfy the foregoing requirements.  As set forth in the Management Agreement, all expenses of such work are for the account of Lessor.

2.  **Rent (Sections 8.1 and 6.2):**

Fixed Rent:  During the Term, Air Carrier shall pay to Lessor a rental fee of $10.00 per year for each year during the term, payable in advance on the first day of the Term and on each anniversary date of the first day of the Term.

Variable Rent:  During the fourth and subsequent years of the Term, Air Carrier also shall pay to Lessor a rental fee per block hour based on the hours that the Aircraft is operated for Third Party Flights.  As set forth in Section 6.2 of this Agreement, the hourly flat rental fee shall be calculated upon actual hours flown, including any ferry legs, at the rate of $250.00 per block hour for each hour in excess of 300 block hours operated in any month.

Any training or maintenance flights conducted by Air Carrier shall be limited to flights necessary to complete (i) differences training required to serve as a flight crew member on the Aircraft, or (ii) to complete initial Aircraft qualification of flight crew members assigned solely to the Aircraft.

3.  **Referral Fee (Section 6.3):**

The conditions for the Referral Fee payable to Lessor in certain circumstances are set forth in Section 6.2 of this Agreement.

SCHEDULE C
To Aircraft Dry Lease Agreement


<u>Defined Terms</u>

As used in this Agreement, the terms set forth below shall have the meanings indicated below:

(a)  "**AD**" has the meaning given thereto in Section 7.4.

(b)  "**Agreement**" means this Aircraft Dry Lease Agreement (Part 121 Operations).

(c)  "**Air Carrier**" means Eastern Airlines, LLC, a Virginia limited liability company.

(d)  "**Air Carrier Agent Flight Support Personnel**" means the Flight Crew who are not directly employed by Air Carrier but serve in the Flight Crew capacity as agents of the Air Carrier.

(e)  "**Air Carrier Certificate**" means collectively that air carrier operating certificate number 2DYA074Q issued to Air Carrier by the FAA under Parts 119 and 121 of the FAR, and the registration of the Air Carrier with the DOT as a certificated air carrier in commercial operations under the FAR.

(f)  "**Air Carrier Flights**" means Commercial Flights and Air Carrier Non-Commercial Flights.

(g)  "**Air Carrier Non-Commercial Flights**" means maintenance flights, training flights, ferry or positioning flights and other similar non-revenue flights that are operated by Air Carrier under FAR Part 91.

(h)  "**Aircraft**" means collectively each Airframe, the Engines thereon, the Aircraft Documents and the Support Equipment.

(i)  "**Aircraft Documents**" has the meaning given thereto in <u>Exhibit E</u> to this Agreement.

(j)  "**Airframe**" means each of the two Boeing model 767-232ER airframes bearing manufacturer's serial numbers 25193 and 25194 respectively, as the same are more particularly described in <u>Schedule A</u> annexed to this Agreement.

(k)  "**Airframe Manufacturer**" means The Boeing Company.

(l)  "**APU**" means auxiliary power unit.

(m)  "**Business Day**" shall mean any day other than a day on which banks in New York, New York are required or permitted to be closed.

(n)  "**Commercial Flight**" means the possession and operation of the Aircraft by Air Carrier under FAR Part 121 in commercial scheduled service or charter for hire under this Agreement and the Air Carrier Certificate and shall include all flights operated by Air Carrier for NEP LLC under the Private Carriage Agreement.

(o)  "**Current Manager**" means Team 125, Inc.

(p)  "**Delivery Condition**" means the condition of the Aircraft described in <u>Schedules B</u> (including the EIS Conditions as defined in Appendix 1 thereto) and <u>C</u> annexed to the Management Agreement.

(q)  "**Delivery Date**" means the date on which delivery of the Aircraft by Lessor is accepted by Air Carrier pursuant to Section 3 of this Agreement.

(r)  "**Delivery Inspection**" has the meaning given thereto in Section 3.1 of this Agreement.

(s)  "**DOT**" means the United States Department of Transportation.

(t)  "**Effective Date**" means the date on which the parties entered into the Management Agreement.

(u)  "**Engine**" means respectively each of the aircraft engines described in <u>Schedule A</u> annexed hereto.

(v)  "**FAA**" means the Federal Aviation Administration.

(w)  "**FAR**" means the Federal Aviation Regulations, Title 14 Code of Federal Regulations.

(x)  "**Flight Crew**" means pilots who satisfy the conditions set forth in Section 9.1 and are utilized by the Air Carrier for an Air Carrier Flight.

(y)  "**Lessor**" means 2/25/94 LLC, a Delaware limited liability company.

(z)  "**Lessor Referral**" has the meaning given thereto in Section 6.3.

(aa) "**Lessor Related Party**" means any Member of Lessor and any entity controlled by or under common control with Lessor or any Member of Lessor.

(bb) "**Letter Checks**" has the meaning given thereto in Section 7.2.

(cc) "**Line Maintenance**" has the meaning given thereto in Section 7.3.

(dd) "**Management Agreement**" means that Aircraft Management Agreement of even date herewith between Lessor as customer and Air Carrier, as manager.

(ee) "**Operational Control**" has the meaning given thereto in 14 CFR Section 1.1.

(ff)  "**Possession, Command, and Control**" means operational control (as defined in Section 1.1 of the FAR as such may be amended or modified from time to time) and possession, command, and control as such term is used by the Internal Revenue Service in connection with Internal Revenue Code Section 4261, and the Treasury Regulations and rulings promulgated thereunder to determine if taxable transportation has been furnished.

(gg) "**Private Carriage Agreement**" means that Private Carriage Agreement entered or to be entered into between Lessee as carrier and NEP LLC, a Delaware limited liability company, as customer.

(hh) "**Redelivery Condition**" means the condition of the Aircraft described in <u>Schedule D</u> to this Agreement.

(ii)  "**Redelivery Inspection**" has the meaning given thereto in Section 3.3 of this Agreement.

(jj)  "**Referral Fee**" has the meaning given thereto in Section 6.2 of this Agreement.

(kk) "**Rent**" means the amount set forth in <u>Schedule B</u> as Rent.

(ll)  "**SB**" has the meaning given thereto in Section 7.4.

(mm)  "**Support Equipment**" means Boeing 767-related material (including expendable and repairable parts, wherever located) owned by Customer or NEP LLC.

(nn) "**Term**" has the meaning given thereto in Section 2.1 of this Agreement.

(oo) "**Third Party Flights**" has the meaning given thereto in Section 6.1 of this Agreement.

(pp) "**Transaction Documents**" shall mean collectively this Agreement, the Management Agreement and the Private Carriage Agreement.

SCHEDULE D
To Aircraft Dry Lease Agreement

*[NOTE:  THE TERMS OF THIS SCHEDULE D ARE CONFIDENTIAL AND CONTAIN COMMERCIALLY SENSITIVE INFORMATION; THIS SCHEDULE D MUST BE REMOVED FROM ANY PUBLIC FILING OF THIS AGREEMENT]*

DELIVERY CONDITION

For purposes of this Agreement, each Aircraft shall be delivered to and accepted by Air Carrier at the Delivery Location in the condition described in this Schedule D (including the EIS Modifications as defined in Appendix 1 hereto) and in Schedule E below (collectively the "Delivery Condition").

**1.    GENERAL**

1.1.    The Aircraft shall be registered in the United States and shall have an FAA Airworthiness Certificate that shall be effective upon entry into service ("EIS"), with all EIS Conditions (as set forth in Schedule E) satisfied.

1.2.    The Aircraft exterior shall be washed, and the interior shall be clean by commercial passenger airline standards.  All placards shall be in the English language.  Any placards required pursuant to the Airframe Manufacturer's aircraft maintenance manual shall be replaced if unreadable or missing.  Placards that are not required pursuant to the Airframe Manufacturer's aircraft maintenance manual, but prohibited pursuant to Air Carrier's Operations Specifications, shall be removed upon Air Carrier's request.

1.3.    The Aircraft shall comply with all AD's required by the FAA and which are applicable to the Aircraft, Engines, Landing Gear, APU and parts which by their terms require compliance on or before the Delivery Date.  If the AD provides for an alternative means of compliance, then compliance with such AD shall be by the most restrictive method of compliance, if required by the Air Carrier's Operations Specifications.

1.4.    The Aircraft and Engines shall be in compliance with all Manufacturers' mandatory service bulletins.

1.5.    The Aircraft (including each Engine, Landing Gear, APU, and part) shall not have any open, deferred or placarded maintenance items or watch items, nor shall they have any Flight Hour, Cycle or calendar time extensions or waivers.

1.6.    Lessor shall deliver to Air Carrier, at no cost to Air Carrier, all service bulletin kits that were furnished to Lessor free of charge and which have not been installed together with appropriate instructions for installation provided with such kits.

1.7.    Lessor shall provide Air Carrier with a true, correct and complete copy of the maintenance program for the Aircraft, or electronic access to the same.

1.8.   The manufacturer's repair manuals will be up to date and shall include the most recent revisions issued by the manufacturer.

**2.     AIRCRAFT EXTERIOR**

The Aircraft exterior shall be in its current condition.

**3.     TIME CONTROLLED PARTS**

Each time-controlled part installed in the Aircraft shall be current at the time of Delivery.

**4.     INTERIOR**

In its then current passenger configuration.

**5.     ENGINES, APU AND LANDING GEAR**

5.1.   Air Carrier shall have the right to accomplish a video borescope of the compressor, combustion and turbine sections of each Engine and the APU.  All defects discovered as a result of such borescope inspections which exceed the manufacturer's maintenance manual limits for an installed engine or APU shall be corrected at Lessor's expense.  The borescope inspection shall be accomplished following the delivery acceptance flight or max power assurance engine run.

5.2.   Each Engine shall have 3,000 Cycles remaining to the Engine Manufacturer's then-published life limit for each such Engine Life Limited Part.

**Appendix 1 to
Schedule D to Aircraft Dry Lease Agreement**


Following the Effective Date, Air Carrier will procure the services of a qualified maintenance, repair and overhaul facility (**"MRO"**) and manage the following entry-into-service modifications to be accomplished on the Aircraft by such MRO prior to Delivery:


<u>EIS MODIFICATIONS (MSN 25193)</u>


Modify the interior (including installation of equipment) of Aircraft 25193 as necessary in order to qualify the Aircraft for entry into service under Air Carrier's FAR Part 121 operations specifications.


<u>EIS MODIFICATIONS (MSN 25194)</u>


1.      Modify and as necessary reconfigure the interior (including installation of equipment) of Aircraft 25194 to a 240-seat, full Y-class interior compliant with applicable FAA Approved and Accepted data; and


2.      install a class II crew rest facility; and


3.      modify installed in-flight entertainment ("IFE") system to support a 240-seat LOPA configuration;

(collectively, for Aircraft 25193 and Aircraft 25194, the "**EIS Modifications**").

Air Carrier shall, on behalf of Lessor, manage the process of accomplishing the EIS Modifications including developing the workscope, procuring bids from qualified MROs, working with Lessor in evaluating bid responses and MRO selection and overseeing Aircraft induction and completion of the EIS Modifications. Lessor shall contract with the MRO accomplishing the EIS Modifications and pay for all costs (including, without limitation, labor, parts, material, engineering and certification) to accomplish the same. Prior to commencing the EIS Modifications, Air Carrier shall submit a budget, proposed seating and interior finishing, and LOPA to Lessor for the EIS Modifications, which shall be approved by Lessor, acting reasonably.

SCHEDULE E
To Aircraft Dry Lease Agreement

*[NOTE:  THE TERMS OF THIS SCHEDULE E ARE CONFIDENTIAL AND CONTAIN COMMERCIALLY SENSITIVE INFORMATION; THIS SCHEDULE E MUST BE REMOVED FROM ANY PUBLIC FILING OF THIS AGREEMENT]*

## ENTRY INTO SERVICE CONDITIONS

1. The Aircraft shall comply with all applicable FAA requirements for passenger operation pursuant to FAR Part 121.

2. The Aircraft will have been bridged to Air Carrier's FAA-approved FAR Part 121 maintenance program at Lessor's cost.

3. The EIS Modifications shall have been completed and the Aircraft shall have been added to Air Carrier's FAR Part 121 Operations Specification.

4. All interior equipment and furnishings in the interior of the Aircraft that are defective, or damaged shall be repaired in accordance with the Manufacturer's recommended repair procedures or replaced by.

5. The APU shall be in serviceable condition with no discrepancies that exceed the Manufacturer's maintenance manual allowable limits.

6. Immediately prior to Entry-into-Service, Lessor shall cause Air Carrier to perform a Max Power Assurance engine run (MPA) of the Aircraft and engines with Air Carrier's representatives on board, using the Airframe Manufacturer's recommended procedures, or such other procedures acceptable to Lessor and Air Carrier. Such MPA shall be of a sufficient duration to complete all such procedures.  Air Carrier shall ensure Lessor's representative has observed each discrepancy found. Immediately following the MPA, Lessee shall perform the borescope inspections of the Engines and APU as provided in Section 5.1 of the Delivery Conditions.  Each discrepancy found during the course of the MPA and borescope inspections shall be listed in writing and signed by the representatives of both Air Carrier and Lessor. To the extent any such discrepancy exceeds or is outside of the Airframe Manufacturer's maintenance manual allowable limits, Lessor shall correct such discrepancy. Lessor shall be responsible for all expenses associated with such MPA and borescope inspections and shall furnish the necessary permits, crews and fuel.

7. Air Carrier shall inspect the Aircraft, including the Aircraft Documents, prior to Entry-into-Service, and as part of its conformity inspection.  The Delivery Inspection of the Aircraft shall include only the opening or removal of panels as reasonably required by Air Carrier to add each Aircraft to its Part 121 Certificate. All discrepancies discovered during

such Delivery Inspection (a) of the Aircraft that exceed the Manufacturer's Repair Manual allowable limits, or that are not the responsibility of Air Carrier (i.e. line check items) pursuant to the terms of the Agreement, shall be repaired by Lessor and (b) of the Aircraft Documents, to the extent that such Aircraft Documents are missing or incomplete, shall be corrected at Lessor's expense. All Aircraft Documents shall be complete and made available to Air Carrier at the time of commencement of the Delivery Inspection. Any Aircraft Documents generated during the period following commencement of such inspection of the Aircraft Documents shall be delivered to Air Carrier for inspection as promptly as possible, but in any event prior to entry- into-service

8. Any discrepancies found in the Aircraft Documents during the Inspection shall be corrected by Air Carrier, with the cooperation of the Lessor, and any missing documents shall be reconstructed by Air Carrier, with the cooperation of the Lessor, at Lessor's sole cost and expense prior to Entry-into-Service of the Aircraft.  All Aircraft Documents shall be in the English language.  If any Aircraft Documents are not provided to Air Carrier, or are not in the English language, the Aircraft shall be deemed not to meet the Entry-into-Service conditions.  Documents may be translated to English at the Lessor's expense.

9. All Aircraft and engine systems (including those in galleys, passenger compartments and cargo compartments) shall be fully operational for their intended functions. Air Carrier's representatives shall operationally check all systems prior to Entry-into-Service and all defects found shall be repaired by Lessor, at Lessor's expense, prior to Entry-into-Service.

For purposes of this Agreement, the term "**Aircraft Documents**" means, in respect of each Aircraft, all historical records and documentation pertaining to the Aircraft that are related to the maintenance, inspections and alterations, modifications and additions accomplished with respect to the Aircraft and as are required by Air Carrier to transition the Aircraft to Air Carrier's FAR Part 121 operations specification and otherwise fulfill its obligations under the dry lease and management agreement.  All references in this Agreement to an Aircraft shall be deemed to include such Aircraft's related Aircraft Documents.

SCHEDULE F
To Aircraft Dry Lease Agreement

*[NOTE: THE TERMS OF THIS SCHEDULE F ARE CONFIDENTIAL AND CONTAIN COMMERCIALLY SENSITIVE INFORMATION; THIS SCHEDULE F MUST BE REMOVED FROM ANY PUBLIC FILING OF THIS AGREEMENT]*

REDELIVERY CONDITION

Each Aircraft shall be returned by Air Carrier and accepted by Lessor (**"Redelivery"**) at a mutually acceptable return location in the contiguous United States in the following condition (**"Redelivery Condition"**):

## 1. GENERAL

1.1.    The Aircraft shall be registered in the United States and shall have an FAA Certificate of Airworthiness.

1.2.    The Aircraft exterior shall be washed, and the interior shall be clean by commercial passenger airline standards in the same condition as it was delivered, normal wear and tear excepted.

1.3.    All placards shall be in the English language. Any placards required pursuant to the Airframe Manufacturer's aircraft maintenance manual shall be replaced if unreadable or missing. Placards that are not required pursuant to the Airframe Manufacturer's aircraft maintenance manual shall be removed upon Lessor's request.

1.4.    The Aircraft shall comply with all AD's required by the FAA and which are applicable to the Aircraft, Engines, Landing Gear, APU and parts which by their terms require compliance on or before the Redelivery (return) Date. If the AD provides for an alternative means of compliance, then compliance with such AD shall be by the most restrictive method of compliance.

1.5.    The Aircraft (including without limitation, Engines, APU and Landing Gear) shall comply with all applicable FAA requirements for passenger operation pursuant to FAR Part 121.

1.6.    The Aircraft and Engines shall be in compliance with all Manufacturers' mandatory service bulletins.

1.7.    At Redelivery, the Aircraft (including each Engine, Landing Gear, APU, and part) may not have any open logbook items; provided that the Aircraft may have deferred or placarded maintenance items, watch items, Flight Hour, Cycle or calendar time extensions or waivers in accordance with approved/acceptable data, and provided further that items deferred in accordance with the MMEL do not expire within 30 calendar days from the date of Redelivery.

1.8.  Air Carrier shall provide Lessor with a true, correct and complete copy of Air Carrier's FAA-approved maintenance program for the Aircraft; provided that the same shall be subject to restricted disclosure pursuant to Section 12.1 of the Management Agreement and the Master Non-Disclosure Agreement between Air Carrier and New England Patriots LLC dated June 5, 2019.

1.9.  The manufacturer's repair manuals will be up to date and shall include the most recent revisions issued by the manufacturer.

## 2. AIRCRAFT EXTERIOR

Each Aircraft exterior shall be in same condition as it was at Delivery, ordinary wear and tear excepted.

## 3. AIRFRAME

The Airframe shall be in "As-Is" condition subject to paragraph 1 above.

## 4. INTERIOR

4.1.  In its then current passenger configuration, in the same condition as at Entry-into-Service, ordinary wear and tear excepted.

4.2.  All equipment and furnishings in the interior of the Aircraft that is defective, or damaged shall be repaired in accordance with the Manufacturer's recommended repair procedures or replaced by Air Carrier.

## 5. ENGINES, APU AND LANDING GEAR

5.1.  Lessor shall have the right to accomplish a video borescope of the compressor, combustion and turbine sections of each Engine and the APU.  All defects discovered as a result of such borescope inspections which exceed the manufacturer's maintenance manual limits for an installed engine or APU shall, at Lessor's request and expense (as provided in Section 7), be corrected by Air Carrier.

5.2.  Air Carrier shall at Lessor's option perform a Maximum Power Assurance Test in accordance with the manufacturer's maintenance manual and using temperature corrected charts to demonstrate that each Engine will be capable of reaching full take-off power at an outside air temperature of thirty (30) degrees Celsius.  Air Carrier shall, at Lessor's request and expense (as provided in Section 7), correct any deficiencies that exceed the Airframe Manufacturer's Maintenance Manual allowable limits for an installed engine.

5.3.  Each APU shall be in "As-Is" condition, subject to Section 7.

5.4.  Each Landing Gear shall be in "As-Is" condition, subject to Section 7.

## 6. INSPECTION

6.1.    Immediately prior to Return, Lessor may cause Air Carrier, at Air Carrier's cost and expense, to perform a maximum power assurance run (**"MPA"**) with Lessor's representatives present, in accordance with the Airframe Manufacturer's maintenance manual to include engine operational check procedures, or such other procedures acceptable to Lessor and Air Carrier. Air Carrier shall ensure Lessor's representative has observed each discrepancy found. Immediately following the MPA, Air Carrier shall perform borescope inspections of the Engines and APU. Each discrepancy found during the course of the MPA and borescope inspections shall be listed in writing and signed by the representatives of both Air Carrier and Lessor. To the extent any such discrepancy exceeds or is outside of the Airframe Manufacturer's maintenance manual allowable limits for an installed engine, Lessor may request that Air Carrier correct such discrepancy subject to the cost allocations for maintenance set out in this Agreement.

6.2    Lessor shall inspect the Aircraft, including the Aircraft Documents (the **"Redelivery Inspection"**) prior to the scheduled redelivery date. The Redelivery Inspection of the Aircraft shall include only the opening or removal of panels as reasonably required by Lessor. All discrepancies discovered during such Redelivery Inspection (a) of the Aircraft that exceed the Manufacturer's Repair Manual allowable limits, or that are not in compliance with the conditions set forth above, shall be repaired by Air Carrier and (b) of the Aircraft Documents, to the extent that any such Aircraft Documents for which Air Carrier had an obligation to maintain (and which were delivered with the Aircraft) are missing or incomplete, shall be corrected at Air Carrier's expense. All Aircraft Documents shall be complete and made available to Lessor at the time of commencement of the Redelivery Inspection. Any Aircraft Documents generated during the period following commencement of such Redelivery Inspection of the Aircraft Documents shall be delivered to Lessor for inspection as promptly as possible, but in any event prior to Redelivery.

6.3.    All Aircraft Documents shall be in the English language. If any Aircraft Documents generated by Air Carrier during the term of the Agreement are not provided to Lessor, or are not in the English language, the Aircraft shall be deemed not to meet the Redelivery Condition. Documents may be translated to English at the Air Carrier's expense.

6.4.    All Aircraft and Engine systems (including those in galleys, passenger compartments and cargo compartments) shall be fully operational for their intended functions. Lessor's representatives shall operationally check all systems prior to Redelivery and all defects found shall be repaired by Air Carrier, at Lessor's expense, prior to Redelivery.

Exhibit 1
To Aircraft Dry Lease Agreement

**LEASE SUPPLEMENT NO. _____**
Under Aircraft Dry Lease Agreement dated as of June \_\_\_\_, 2020

**LEASE SUPPLEMENT NO. \_\_\_\_** under Aircraft Dry Lease Agreement dated as of June \_\_\_\_, 2020 (the "Agreement") between **2/25/94 LLC** as lessor ("Lessor") and **Eastern Airlines, LLC** as lessee ("Air Carrier").

1.      **LEASE OF THE AIRCRAFT**.

Pursuant to the Agreement, Lessor has agreed to lease the Aircraft to Air Carrier, and Air Carrier has agreed to lease the Aircraft from Lessor.  As applied to the Aircraft, the terms and provisions of the Lease are hereby incorporated in this Lease Supplement No. \_\_\_\_ by this reference as if set forth fully herein.  Air Carrier hereby certifies that the Aircraft described in Schedule A hereto has been delivered to Air Carrier, inspected by Air Carrier, found to be in good order and condition and accepted by Air Carrier under the Agreement, all on the date hereof.

2.      **REPRESENTATIONS BY AIR CARRIER**.

Air Carrier hereby represents and warrants to Lessor that on the date hereof:

(a) The representations and warranties of Air Carrier set forth in the Agreement are true and correct in all material respects as though made on and as of the date hereof;

(b) Air Carrier has satisfied or complied with all requirements to be satisfied or complied with by it on or prior to the date hereof as set forth in the Agreement; and

(c) No event of default by Air Carrier under the Agreement has occurred and is continuing on the date hereof.

3.      **TERM.**

The parties agree that the Term (as defined in the Agreement) with respect to the Aircraft commences on the date hereof and ends on February 21, 2026.

4.      **COUNTERPART EXECUTION**.

This Lease Supplement may be executed in any number of separate counterparts, each of which when so executed and delivered, shall be an original, but all such counterparts shall together constitute but one and the same instrument. The single executed original of this Lease Supplement marked "Original" shall be the Original and all other counterparts hereof shall be duplications and marked "Duplicate."  To the extent that this Lease Supplement constitutes chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable

jurisdiction, no security interest in this Lease Supplement may be created through the transfer or possession of any counterpart other than the Original.

       **IN WITNESS WHEREOF**, Lessor and Air Carrier have caused this Lease Supplement No. _____ to be duly executed by their respective, duly authorized representatives this _____ day of _____, 2020.

**2/25/94 LLC**, as Lessor            **EASTERN AIRLINES, LLC**, as Air Carrier

By: _____      By: _____

### SCHEDULE A TO LEASE SUPPLEMENT NO. _____
Under Aircraft Dry Lease Agreement dated as of June _____, 2020


### AIRCRAFT DESCRIPTION


The Aircraft comprises the Airframe and the Engines described below:


**Airframe Make and Model:**          Boeing 767-323ER


**Airframe Serial Number:**           [25193]  [25194]


**U. S. Registration Number:**        [N36NE]  {N225NE]


**Engine Make and Model:**            General Electric CF6-80 Series


**Engine Serial Numbers:**            [690360/690368]  [690252/690321]


Together with all attachments, accessories, appliances, additions, substitutions, instruments, avionics and other equipment pertaining to the Aircraft, all substitutions therefor and replacements thereof, and all logs, manuals and documentation relating to the Airframe or the Engines (collectively the "Equipment").

Each Engine is rated at greater than 1,750 pounds of thrust or the equivalent thereof.