# **Exhibit B**

*Execution Version*

## AIRCRAFT MANAGEMENT AGREEMENT

THIS AIRCRAFT MANAGEMENT AGREEMENT (this "Agreement") is entered into this _29_ day of June, 2020 (the "Effective Date") between **Eastern Airlines, LLC**, a Virginia limited liability company ("Manager"), and **2/25/94 LLC**, a Delaware limited liability company ("Customer").

WHEREAS Customer is the owner of those Boeing model 767-323ER aircraft bearing manufacturer's serial numbers 25193 and 25194 respectively (as further described in Schedule A annexed hereto, each herein respectively "Aircraft 25193" or "Aircraft 25194," or an "Aircraft") and desires to obtain professional management and maintenance supervision for the Aircraft and to place the aircraft in revenue service; and

WHEREAS Manager is engaged in the business of providing professional management and maintenance supervision services for scheduled and on-demand air transportation with aircraft of the same type as the Aircraft; and

WHEREAS Customer desires to lease the Aircraft to Manager pursuant to an Aircraft Dry Lease Agreement (Part 121 Operations) of even date herewith between Customer as lessor and Manager as lessee (the "Lease"), for use in Manager's commercial revenue operations; and

WHEREAS Customer's affiliate New England Patriots LLC ("NEP LLC") desires to receive air transportation services from Manager in the Aircraft pursuant to a Private Carriage Agreement to be entered into between them (the "Private Carriage Agreement");

NOW THEREFORE in consideration of the foregoing, the mutual promises contained in this Agreement and the lease of the Aircraft by Customer to Manager pursuant to the Lease, the parties hereto do hereby agree as follows:

1. **Support Services**

1.1. Specific Services Hereunder. Manager agrees to provide to Customer the following support services (collectively, the "Support Services"), with respect to which Manager shall act as Customer's agent:

   (a) Arrange for and oversee all work to place the Aircraft in Delivery Condition (as defined in in the Lease) for purposes of the Lease;
   (b) Arrange for and oversee all work and other undertakings necessary to keep the Aircraft on Manager's Air Carrier certificate.
   (c) During the term of this Agreement, oversee and coordinate scheduling of all Aircraft maintenance requirements;
   (d) [reserved];
   (e) Locate and assist in the negotiations for Aircraft hangar, office, MRO services and shop facilities;
   (f) To the extent not already contemplated by the Lease, conduct recordkeeping, reporting, budgeting, payment of Aircraft-related invoices, and other administrative requirements;
   (g) Obtain and maintain insurance in accordance with this Agreement; and

(h) Assist and otherwise coordinate such upgrades to the Aircraft as Customer may elect to have undertaken during the term hereof (including schedule planning to ensure Aircraft availability to Manager and NEP LLC according to their respective requirements under the Lease and the Private Carriage Agreement).

## 2. Flight Support Personnel

2.1. <u>Personnel Covered</u>.  In the context of this Agreement, maintenance personnel employed by Manager and assigned to the Aircraft are collectively referred to as "Flight Support Personnel." Flight Support Personnel will be employed by Manager and carried on the payroll of Manager. Flight Support Personnel will be appropriately certified and trained as required by the Federal Aviation Regulations (the "<u>FAR</u>") and Manager's recommendations.

2.2. <u>Current Crews</u>.  Manager will offer to hire the flight crews and cabin crews currently employed by the Current Manager and serving on Customer and NEP flights ("<u>Existing Crewmembers</u>"), subject to each such crewmember meeting Manager's employment requirements and mutual agreement to terms of employment. Customer will reimburse Manager's initial indoctrination and training costs incurred for Existing Crewmembers to complete, as applicable, transition and familiarization training to serve as crewmembers on the Aircraft and operate under Manager's FAR Part 121 operations.

2.3. <u>Training</u>.  Manager's supervisory personnel will conduct required training to observe Flight Support Personnel performance.

2.4. <u>Performance Review; Substandard Performance</u>.  Manager shall conduct an annual performance review for all Flight Support Personnel. Customer may provide commentary in connection with such performance review. If any Flight Support Personnel should not perform his or her duties, Manager shall withdraw such individual and provide a qualified replacement.

2.5. <u>Employment Relationship</u>.  At all times during the term of this Agreement, the Flight Support Personnel will remain employees of Manager and all of their compensation will be paid by Manager. Customer requests that Manager make recommendations concerning termination or replacement of assigned Flight Support Personnel. All salaries, wages, payroll taxes, fringe benefits and Workers' Compensation payments applicable to Manager's employees shall be the sole responsibility and cost of Manager.

2.6. <u>Occupational Safety and Health Act of 1970</u>.  As between Customer and Manager, to the extent if any that such laws apply to any facilities under Customer's control, Customer is responsible for assuring that its worksites at which personnel will work comply with the standards, rules, orders and regulations promulgated or prescribed pursuant to the Occupational Safety and Health Act of 1970, as amended, and any applicable state laws. If an action is undertaken against Manager for violations by Customer, its agents or employees of any governmental safety requirements, Customer shall indemnify and hold harmless Manager for all costs, damages and penalties assessed against Manager in or related to such action including attorney's fees incurred in the defense or appeal of such action, except to the extent caused by the negligence or willful misconduct of Manager. If an action is undertaken against Customer for violations by Manager, its agents or employees of any

2

governmental safety requirements, Manager shall indemnify and hold harmless Customer for all costs, damages, and penalties assessed against Customer in or related to such action including attorney's fees incurred in the defense or appeal of such action, except to the extent caused by the negligence or willful misconduct of Customer.

2.7. <u>Charter Coordinator</u>.  Manager shall hire John Gaff ("<u>Gaff</u>") to serve as charter coordinator liaison among Manager, Customer and NEP LLC, <u>provided that</u> Gaff satisfies the operational requirements of such role and agrees to be employed by Manager.  If Gaff elects to be employed by Manager, Customer shall be responsible for reimbursing Manager on a monthly basis Gaff's fully burdened (including salary, benefits and expenses) compensation.

2.8. <u>Assignment of Personnel</u>.  All Flight Support Personnel shall be exclusively assigned and dedicated to Customer's Aircraft.  However, Manager may from time to time use the services of any of the Flight Support Personnel.  This section 2.8 shall not relieve Manager of its obligations with respect to cabin staffing as set forth in the Private Carriage Agreement.

## 3.  Flight Support Personnel Training and Qualification

3.1. <u>Personnel Training</u>.  Manager will conduct or coordinate scheduling for Flight Support Personnel training that meets or exceeds the requirements of the FAR governing the type of operation being conducted and Manager's FAR Part 121 operating certificate.  Training will include, but not be limited to:

For mechanics:
(a) Initial aircraft qualification, if required;
(b) Annual aircraft or system (engines, avionics, etc.) recurrent training, as required;
(c) Annual, in-house, recurrent training and continuing, supplemental training in policies and procedures recommended by Manager; and
(d) Any training required by regulation.

For flight crew and cabin crew:
As determined by Manager and set forth in the Annual Budget.

3.2. <u>Training Cost</u>.  Manager supervisory personnel will require a reasonable amount of time to accomplish recurrent training, proficiency checks, and line checks as required by the FAR and procedures recommended by Manager.  Customer shall be responsible and pay for the cost of initial training of (i) Team 125 personnel who are hired by Manager and (ii) personnel hired to exclusively crew the Aircraft, prior to March 1, 2021, as required to staff and fly the Aircraft under this Agreement and the Private Carriage Agreement, and Manager shall be responsible and pay for the cost of all other training.

3.3. <u>Training Record</u>.  Manager shall prepare and periodically update a current training record for Flight Support Personnel documenting satisfactory completion of all training requirements.

3.4. <u>Testing Programs</u>.  Flight Support Personnel shall be enrolled as required in a drug and alcohol testing program.  Manager shall be liable for all third-party fees related to the administration of the program with respect to the Flight Support Personnel.

## 4.  **Aircraft Maintenance**

4.1. <u>Condition of Aircraft</u>.  Manager will ensure that the Aircraft is maintained, repaired and overhauled in accordance with the Lease.

4.2. <u>Equipment</u>.  Manager will obtain FAA authorization for use of the Minimum Equipment List ("<u>MEL</u>") for the Aircraft under the provisions of 14 C.F.R. §§ 91.213, if applicable, and after the Delivery Date (defined in the Lease) shall keep the Aircraft compliant with Subpart K, Instrument and Equipment Requirements, of 14 C.F.R. Part 121.

4.3. <u>Aircraft Records</u>.  Manager will maintain all logs, records and other materials, in paper and/or electronic/digital format, required by the FAA to be maintained with respect to the Aircraft, their engines and systems, and log all flight hours and landings or cycles of the Aircraft and maintain appropriate flight logs recording such hours, landings or cycles of the Aircraft.  Such records will be considered part of the Aircraft and, as such, will remain the property of Customer.  Customer agrees that Manager may retain copies for its own records.

4.4. <u>Inventory</u>.  As soon as practicable after the Effective Date, Customer shall provide Manager with an inventory of all Boeing 767-related material (including expendable and repairable parts, wherever located) owned by Customer or NEP LLC, including locations.

4.5. <u>Maintenance Scheduling</u>.  Manager will coordinate the scheduling of aircraft maintenance (and shall obtain Customer's approval to schedule all such maintenance) which may be subcontracted either to (i) a maintenance facility affiliated with the Manager or (ii) a third party maintenance contractor, each being certified and approved by the relevant aviation authorities to maintain, repair and overhaul the Aircraft as set forth in the Manufacturer's maintenance manual and in accordance with the relevant aviation authorities' rules and regulations.

## 5.  **Records and Administration**

5.1. <u>Records Storage</u>.  Manager shall maintain facilities for storage of Flight Support Personnel records and Aircraft records, flight operations supervision, scheduling assistance, and accounting support.

5.2. <u>Annual Budget; Reports</u>.  Manager will supply Customer with an annual estimated budget and monthly reports summarizing financial activity.  Manager shall prepare an annual budget for the maintenance of the Aircraft for which Customer has an obligation to pay (or contribute to the payment of) and shall submit such budget to Customer for approval at least sixty (60) days prior to the commencement of each year during the term hereof (the "<u>Annual Budget</u>").  Manager shall provide Customer with a quarterly forecast of such anticipated maintenance and inspection work for the Aircraft at Customer's request.  Not later than the 10th day of each month during the term hereof, Manager shall prepare and submit to Customer a report indicating the flights made by the Aircraft during the previous month, and

separately indicating the number of hours and cycles (landings) that the Aircraft was flown during such month.  Manager from time to time shall change the content or format of such reports, as may be requested by Customer in accordance with the requirements of Customer's management.

5.3.  <u>Records Inspection; Retention</u>.  Manager shall maintain all accounting records, maintenance records, inspection reports and any documents similar or relating to the foregoing. Customer or its authorized representative may with seven (7) days prior notice inspect the Aircraft, observe maintenance being performed on the Aircraft (subject to receipt of appropriate approvals and security clearances of the locations where such maintenance is being performed) and inspect, audit and copy the books and records maintained by Manager relating to the Aircraft during Manager's (or such other MRO's) regular business hours and without disruption to Manager's (or such other MRO's) operations.  Manager shall maintain such accounting records for one year following the expiration or other termination of this Agreement and any successor management agreements.

6.  **[Reserved]:**

7.  **Fees, Expenses and Billing Procedures**

7.1.  <u>Fee Waiver</u>.  In consideration of the lease of the Aircraft to Manager pursuant to the Lease, Manager waives any periodic Services Fee which otherwise would be charged to Customer for services hereunder.

7.2.  <u>Aircraft Operating and Maintenance Expenses</u>.  Except as otherwise provided in paragraph (a) or (l) below or Section 7.3 below, maintenance expenses payable by Manager at its expense hereunder include, but are not limited to, the actual cost of the following items incurred for the operation of the Aircraft ("<u>Aircraft Expenses</u>"):

(a) Direct costs to accomplish all scheduled and unscheduled maintenance and inspections, including without limitation third-party labor, materials (including shipping costs and core charges for parts and components), Aircraft relocation, technical support and other incidental costs, <u>provided that</u> Customer shall pay directly to providers or at Manager's option reimburse Manager for:  (1) the direct, documented costs, without markup, to accomplish all scheduled and unscheduled heavy maintenance events (letter checks) required prior to or during the Term (defined in Section 11.1 below), including without limitation third-party labor, materials, Aircraft relocation and other incidental costs, (2) the direct, documented costs, without markup, to accomplish all FAA airworthiness directives ("<u>ADs</u>") and all manufacturer service bulletins ("<u>SBs</u>") requiring termination action, other than recurring inspections, during the Term, and (3) costs of any upgrades and improvements to the Aircraft or any components thereof that Customer may elect to undertake during the Term;

(b) Engine and airframe maintenance service plan fees, to the extent applicable;

(c) Flight Support Personnel employed by Manager and Manager supervisory personnel travel expenses properly incurred in support of the maintenance and management of the Aircraft;

(d) Any and all chart, navigation databases, and maintenance subscriptions;

(e) Communications charges and outside computer services related to Aircraft maintenance;

(f) Charges from professional aviation search firms to recruit, test, and hire initial and replacement Flight Support Personnel;

(g) Substitute Flight Support Personnel, if any, provided hereunder;

(h) Required annual medical examinations, alcohol and drug testing of Flight Support Personnel;

(i) Flight Support Personnel salaries (including all applicable payroll taxes, if employed by Manager), as provided in Section 2.5, as applicable;

(j) If employed by Manager, Flight Support Personnel benefits, as provided in Section 2.6;

(k) Aircraft Operating Base hangar, supplemental hangar or ramp space, office and shop rent, utilities and related expenses;

(l) Flight Support Personnel professional training in accordance with Section 3.1, and related travel expenses, including training required of Management supervisory personnel in accordance with Section 3.2; and

(m) Cost of Manager's annual, in-house, recurrent training of Flight Support Personnel as recommended under Manager's policies and procedures and any other reasonable travel and other expenses incurred, provided that initial indoctrination training of Flight Support Personnel and assigned to the Aircraft on the Effective Date shall be for the account of Customer.

7.3. <u>Non-Recurring Expenses</u>. Notwithstanding the foregoing, Customer shall be responsible to pay or reimburse Manager for all Non-Recurring Expenses. Non-Recurring Expenses include but are not limited to such items as all work to place the Aircraft in Delivery Condition, Aircraft paint and refurbishing for MSN 25193, major maintenance items such as engine, auxiliary power unit, and landing gear overhaul and airframe maintenance and modifications made at Owner's request or otherwise required for Manager to fulfill its obligations under this Agreement, the Private Carriage Agreement or the Lease, one-time personnel relocation expenses (if previously employed by Team 125, and employed by Manager solely to fulfil Manager's obligations under this Agreement and the Private Carriage Agreement) initial maintenance ground support equipment set forth on Schedule B, initial spare parts provisioning and inventories set forth on Schedule C, office and shop equipment, communications and computer equipment for Flight Support Personnel (if employed by Manager), as reasonably required by Manager at KPVD airport, Rhode Island, aircraft unit loading devices and special training requirements related specifically to the Aircraft and operations in connection with the same (collectively "<u>Non-Recurring Expenses</u>"). Other Non-Recurring Expenses include but are not limited to the following:

    (a) All reasonable travel and other expenses for Manager's employees, Flight Support Personnel (if employed by Manager), and/or contractors to conduct the certification and conformity inspection, audits and to accomplish initial indoctrination training of Existing Crewmember;

    (b) Non-Recurring Expenses will be invoiced to and payable by Customer, except that any Non-Recurring Expense in excess of $25,000 may, at Manager's discretion, be required to be paid by Customer directly to the vendor, or invoiced to Customer at Manager's net cost on a supplemental invoice which will be due upon receipt.

7.4. <u>Expense Limits</u>.   Notwithstanding anything to the contrary contained herein, unless included in an agreed budget, Manager will make or incur without the prior written approval of Customer no expenditure payable or reimbursable by Customer hereunder in excess of USD$20,000 for any single item or cumulatively for parts or maintenance items for which estimates have not been made in Annual Budget, except that Manager shall have the authority to incur an expense greater than such respective limit for fuel required to conduct flights for or on behalf of Customer under this Agreement and/or the Private Carriage Agreement or if the expense is reasonable and necessary and if Manager has attempted to contact Customer and the part or item or the immediate performance of the service to which such expense relates is required in order to perform any scheduled mission of the Aircraft or to secure the Aircraft or return it to the Aircraft Operating Base.

7.5. <u>Invoicing to Customer</u>.   Except as otherwise provided in Sections 7.3 and 7.4, Aircraft Expenses and Non-Recurring Expenses will first be paid by Manager on behalf of Customer, and then the expenses payable by Customer under this Section 7 will be re-invoiced to Customer at Manager's documented cost.   Manager will issue to Customer an invoice detailing all charges to Customer's account for the preceding month.  This invoice will be due 30 days from the invoice date.

7.6. <u>Post-Termination True-Up</u>.   No later than 90 days following the expiration or termination of this Agreement, Manager will provide Customer a final statement of the Aircraft Expenses and Non-Recurring Expenses since the last statement provided by Manager. Notwithstanding the foregoing, upon receipt of invoice from Manager, Customer shall immediately reimburse or pay all Aircraft Expenses, Non-Recurring Expenses, and any other unpaid amounts to the extent due to Manager under this Agreement which remain unpaid following issuance of the final statement.   The provisions of this Section will survive the expiration or other termination of this Agreement.

7.7. <u>Unpaid Amounts</u>.   Manager shall issue its periodic invoices for expenses under this Agreement in the name of Customer.   Any amount not paid to Manager when due under this Agreement shall bear interest at a rate equal to one and one-half percent (1-1/2%) per month.

7.8. <u>Volume Discounts</u>.   Manager will pass through to Customer the benefit of discounts available to Manager and applicable to the Aircraft on account of volume purchasing of fuel, OEM parts, insurance, and related services.

## 8.  Insurance and Indemnity

8.1. <u>Fleet Policy; Premiums</u>.  Commencing on the Effective Date, Manager will insure each Aircraft under its fleet policy during the Term as provided in this Section 8.  For the period from the Effective Date to the Delivery Date, the cost of insurance shall be at the expense of the Customer.  Commencing upon the Delivery Date of each Aircraft, all premiums shall be paid by Manager, subject to contribution from Customer as provided herein.  For purposes of this Section 8, the premium for the first year following the Delivery Date is herein called the "<u>Base Premium</u>."  Thereafter, to the extent Manager's aviation insurance premiums increase, such increase to be substantiated by Manager's aviation insurance broker, Customer shall be responsible for its pro-rata share of the increase in premiums with respect to Aircraft 25193, based on the number of Customer's Aircraft in Manager's fleet divided by total number of aircraft in Manager's fleet ("<u>Owner Premium Contribution</u>").  For purposes of this calculation, Aircraft 25194 shall not be considered an Aircraft of Customer.  Example (assuming a total of 10 aircraft in the fleet):

| | |
|---|---|
| Total Base Premium = | $10,000,000 |
| Actual Year Two (and beyond) Premium = | $11,000,000 |
| Premium Increase = | $ 1,000,000 |

Owner Premium Contribution = Premium Increase x Customer Aircraft / Size of Manager Fleet

= $1,000,000 x 1/10 = $100,000.

Any increase in premium as a result of adding Aircraft 25194 to the policy shall be at the cost of Manager.  It shall be the Manager's obligation to maintain insurance on the Aircraft at all times commencing on the Effective Date.  Any premium increase as a result of Manager adding additional aircraft to its fleet shall be solely the obligation of Manager.

8.2. <u>Insurance Coverage</u>.  Manager will procure and maintain (or cause to be maintained) in full force and effect during the Term policies of insurance of the type and in the minimum amounts stated below covering the liability of Manager:

(a) Comprehensive Airline Liability Insurance (including, without limitation, contractual, public liability for bodily injury and property damage, passenger liability, cargo, product liability) also to include war risk coverage (AVN52E or its equivalent), with a combined single limit of not less than **Minimum Liability Limit** for bodily injury and property damage per occurrence. Such insurance shall be on a 'first dollar basis', but can include deductibles for certain aspects of coverage for not greater than industry standard amounts; and

(b) Hull All-Risk and Hull War Insurance coverage to include all-risk ground, taxiing and flight aircraft hull coverage on an agreed value basis. Coverage shall also include spare engines and parts insurance on an actual cash value basis. Such insurance shall include no greater than industry standard deductibles, but in no event greater than

$1,000,000 (provided that Customer may request that Manager reduce such deductible amount with the associated premium expense to be paid by Customer), and shall insure the Aircraft for not less than the Agreed Hull Insured Value of the Aircraft as set forth in Schedule A annexed hereto.

The liability insurance policies described above will be endorsed to:

(a) Customer, its directors, officers, employees and assigns, and those additional insureds listed on Exhibit A, as additional insureds ("Additional Insured(s)") thereunder as respects Manager's operations and indemnity obligation under this Agreement, the Lease and the Private Carriage Agreement, such additional insured status shall not include the liability of the Customer as respects their legal liability as manufacturer of the Equipment, repairer, supplier or servicing agent;

(b) be primary without right of contribution from any other insurance carried by Customer but only with regard to the liability of Manager;

(c) provide for Cross liability and Severability of Interests clauses in favor of the "Additional Insureds";

The Hull All-Risk and Hull War Insurance policies described above shall be endorsed to:

(a) Manager's insurers agree to a 50/50 claims settlement provision per the terms of AVS103 (or equivalent);

(b) Losses shall be adjusted with the Manager, subject to Customer's approval and payable to the Customer, as Loss Payee(s), as their interests may appear;

(c) Comprehensive Airline Liability Insurance (including, without limitation, contractual, public liability for bodily injury and property damage, passenger liability, cargo, product liability) also to include war risk coverage (AVN52E or its equivalent), with a combined single limit of not less than **Minimum Liability Limit** for bodily injury and property damage per occurrence. Such insurance shall be on a 'first dollar basis', but can include deductibles for certain aspects of coverage for not greater than industry standard amounts; and

Regarding both Hull (including War) and Liability (including War) Insurance policies described above, the following will be endorsed:

(a) To contain a provision requiring Manager's insurers and/or broker to issue notice to Additional Insured(s) and Customer of not less than: thirty (30) days prior written notice of any cancellation or adverse material change / ten (10) days prior notice with regard to cancellation due to non-payment of premium / seven (7) days prior notice regarding War Risk perils, prior to any such cancellation or adverse material change being effective as to the interests of the Additional Insured(s);

(b) Provide that the coverage afforded to the Additional Insured(s) / Loss Payee(s) shall not be invalidated by any act or omission (including misrepresentation and non-

disclosure) of any other insured which results in a breach or violation of any declaration, term, condition, or warranty of the insurance;

(c) waive any rights of subrogation against the Additional Insured(s) / Loss Payee(s), except as a direct result of the gross negligence or willful misconduct of Customer;

(d) Manager's insurers agree to waive their rights to any set-offs or counter claims or any other deduction, whether by attachment or otherwise, in respect of any claim(s) paid;

(e) the Additional Insured(s) / Loss Payee(s) shall have no obligation or liability for premiums, commissions, assessments or calls in connection with the Policy(ies); and

(f) London clauses AVN67B/AVN67C/AVN99/AVS103A (or their equivalents) shall be considered in compliance with the above requirements.

The **Minimum Liability Limit** shall be defined as not less than US$1,000,000,000 for all flight conducted under the Private Carriage Agreement, and for all other flights an amount not less than US$1,000,000,000 (or such lesser amount as Manager may maintain during the term of this Agreement for its other fleet of 767 aircraft, but in no event less than USD$750,000,000). However, in no event shall the applicable limit of liability maintained be less than what is legally required by any governmental jurisdiction having authority where the Aircraft will be operated.

8.3.  Workers' Compensation and Employer Liability.  Each of Manager and Customer shall maintain Workers' Compensation insurance that provides applicable statutory benefits for all of its employees (if any) performing services under this Agreement and Employer's Liability insurance of not less than One Million United States Dollars (USD$1,000,000) for bodily injury to its employees (if any) by accident or disease.

8.4.  Automobile Insurance. Manager will comply with any rules in effect at the airports which the Aircraft operate regarding automobile liability insurance for any Manager vehicle being operated at such airport and upon Customer's request, Manager will provide it a certificate of insurance to such effect.

8.5.  Insurance Certificates.  Customer and Manager agree to provide each other with certificates of insurance evidencing coverage as required of them herein upon execution of this Agreement and annually thereafter or immediately upon request at any time thereafter.

8.6.  Insurers.  Each insurance policy required under this Section 8 shall be issued by a company or companies of recognized responsibility who are qualified to do business in the United States and who (a) will submit to the jurisdiction of any competent state or federal court in the United States with regard to any dispute arising out of the policy of insurance or concerning the parties herein; and (b) will respond to any claim or judgment against Customer, its affiliates, owner and any lessor or lienholder in any competent state or federal court in the United States or its territories.

8.7.  Commercial Availability.  If insurance policies satisfying all the requirements of this Section 8 cannot reasonably be obtained, the parties agree to amend the requirements of this Section 8 to the extent reasonably necessary to conform the requirements of this Section 8 to the

terms and conditions of commercially available insurance. Unless otherwise agreed by the parties, any such amendment shall apply only until insurance may again be reasonably obtained that satisfies the requirements of this Section 8 as of the date hereof.

8.8. <u>Risk; Recourse; Indemnification</u>. As between Customer and Manager, the insurance coverages to be provided by Manager in favor of Customer pursuant to this Section 8 shall be the sole recourse and remedy of Customer, owner and Manager, respectively, with respect to any and all loss or damage to the Aircraft or other property of Customer, owner or Manager, or arising from injury or death of persons, except in the case where such loss or damages (a) are not the subject of a covered claim under the applicable insurance coverages to be maintained hereunder or (b) result from the gross negligence or willful misconduct of Customer or Manager, as applicable (collectively "Excess Damages"). Customer and Manager (each an "Indemnifying Party") shall indemnify and hold harmless each other and such other's respective affiliates, officers, directors, agents, servants, and employees (each an "Indemnified Party") from and against any and all liabilities, claims, demands, suits, judgments, damages, losses, costs, and expenses (including reasonable legal expenses and attorneys' fees) (collectively "Indemnified Claims") which constitute Excess Damages on account of or in any way connected with injury to or death of any third parties or loss of or damage to the property of any third party to the extent resulting from or arising out of the operation of the Aircraft when specified under this Agreement to be under the operational control of such Indemnifying Party.

8.9. <u>Damages Limitation</u>. EXCEPT AS MAY OTHERWISE BE EXPRESSLY SET FORTH IN THE PRIVATE CARRIAGE AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE FOR OR HAVE ANY DUTY FOR INDEMNIFICATION OR CONTRIBUTION TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES, OR FOR ANY DAMAGES FOR LOSS OF USE, ALTERNATE USE, REVENUE, PROFIT (EXCLUDING DIRECT DAMAGES FOR FEES OR EXPENSES DUE MANAGER PURSUANT TO THIS AGREEMENT), BUSINESS OPPORTUNITIES AND THE LIKE, OR LOSS OF OR DAMAGE TO OR DEPRECIATION OF VALUE OF THE AIRCRAFT, ALTERNATE LIFT, OR INSURANCE DEDUCTIBLE, EVEN IF THE PARTY HAD BEEN ADVISED, OR KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES.

8.10. <u>Survival</u>. The provisions of Sections 8.7 and 8.8 will survive the termination or expiration of this Agreement.

9. **Representations and Warranties.** Manager hereby represents and warrants to and agrees with Customer that on the date hereof, and at all times during the term of this Agreement:

9.1. <u>Organization</u>. Manager is a limited liability company duly organized and existing under the laws of the Commonwealth of Virginia and is duly authorized to transact business as a foreign limited liability company in and is in good standing in any other jurisdiction where such authorization is required for Manager to carry on its business from time to time.

9.2. <u>Compliance</u>. The business and operations of Manager are being conducted, and it will perform its obligations hereunder, in accordance with all applicable laws, ordinances, orders,

rules and regulations of the FAA and all Federal, state and/or local and foreign governments, including, without limitation, the provisions thereof relating to wages, hours, collective bargaining and employment practices.

9.3. <u>Manager Permits and Licenses</u>.  Manager holds all permits, licenses, orders, registrations and approvals of all United States Federal, state and local and all foreign governmental regulatory bodies (including without limitation under the FAR) required for it to carry on its business and operations as currently conducted and to maintain, manage and operate aircraft as contemplated by this Agreement.  All such permits, licenses, orders, registrations and approvals are in full force and effect, and no suspension or cancellation of any of them is threatened.  None of such permits, licenses, orders, registrations and approvals will be materially adversely affected by the consummation or performance of this Agreement.

9.4. <u>Advice to Customer</u>.  Manager will advise Customer as to any and all permits, licenses, orders, registrations and approvals of all United States Federal, state and local and all foreign governmental regulatory bodies (including without limitation under the FARs), if any, required for Customer to own and use the Aircraft as contemplated in this Agreement, and will assist Customer in obtaining each of them.

9.5. <u>No Litigation</u>.  There are no actions or proceedings pending or threatened before any court or commission, board or other administrative agency against or affecting the Manager, which, if adversely determined, would have a material, adverse effect on the ability of Manager to fulfill its duties and obligations under this Agreement.

9.6. <u>Regulatory Matters</u>.  No regulatory actions and no investigations by the FAA are in progress, pending or threatened against or with respect to Manager or any of its affiliates, or against any pilots assigned by Manager to the Aircraft.  Manager shall promptly inform Customer about, and promptly provide Customer a copy of, all communications received by Manager from the FAA or any other regulatory authority regarding the Aircraft which relate to safety, and of any decision or order which relates to safety issued by the FAA or any other regulatory authority imposing a penalty or fine on Manager, requiring it to take any remedial action, or otherwise taking enforcement action.

## 10. **Air Charter Services**

10.1. Customer's affiliate NEP LLC has requested air charter transportation services from Manager.  Manager shall provide such services to NEP LLC pursuant to the Private Carriage Agreement, as the same may be amended from time to time, which Private Carriage Agreement shall be binding upon NEP LLC and Manager.  Nothing in this Section 10.1 is intended to create any obligation for Customer or its affiliates to acquire air charter transportation services from or through Manager.

## 11. **Duration and Termination**

11.1. <u>Term</u>.  The initial term of this Agreement commences on the Effective Date and expires on February 21, 2026 (the "<u>Initial Term</u>").  At the expiration of the Initial Term, the term of this Agreement may be renewed for additional periods of 24 months as may be agreed by the parties (the Initial Term and all renewal terms hereof collectively the "<u>Term</u>").

Notwithstanding the foregoing, (a) Customer may terminate this Agreement at any time upon no less than 30 days prior written notice to Manager, if owner sells the Aircraft to an unrelated third party, or (b) either Party may terminate this Agreement upon written notice to the other Party if either Aircraft suffers a total loss.

11.2. <u>Early Termination</u>. This Agreement may be terminated upon written notice by either party not in default hereunder (the "Non-Defaulting Party") if (a) the other party shall fail to make any payment then due hereunder within 10 days of written notice from the Non-Defaulting Party that such payment is past due, (b) the other party shall fail or refuse to perform or observe any other material agreement or obligation of such party set forth in this Agreement, or (c) Customer chooses not to accept Manager's recommendations, which recommendations will be in accordance with the Manager's published manuals, or (d) any representation or warranty of such party set forth in this Agreement shall fail at any time to be true and correct, which failure, refusal, breach or default, if curable, shall not be cured within 30 days after receipt by such party of written notice from the Non-Defaulting Party specifying such failure, refusal, breach or default. In addition, this Agreement may be terminated upon written notice by the Non-Defaulting Party if (e) the other party becomes insolvent or is unable to pay its debts in the ordinary course of business, (f) the other party makes an assignment for the benefit of its creditors, (g) a receiver, liquidator, custodian, trustee or the like is appointed for the other party or its property, (h) the other party commences a voluntary case or consents to the entry of an order for relief in any involuntary case under any applicable bankruptcy or insolvency law, or (i) the other party fails to keep and maintain in full force and effect the insurance coverages required to be maintained by such party in accordance with this Agreement.

11.3. <u>Suspension of Obligations</u>. If Customer fails to make any payment when due under this Agreement, such failure shall be deemed to be a material breach of this Agreement, and Manager may, at its option and 15 days following written notice to Customer, suspend its obligations hereunder pending receipt of overdue payments, in addition to any right of termination of this Agreement in accordance with Section 11.2.

11.4. <u>Manager's Termination Rights</u>. In addition to the termination rights of either party, Manager may terminate this Agreement immediately upon written notice to Customer, if (a) the registration of the Aircraft shall become invalid, or the Aircraft shall be sold or exclusively leased by owner or Customer to a third party, (b) any lease, operating or financing agreement applicable to Customer or the Aircraft shall be declared in default and any party to such Agreement other than Customer shall demand or request possession of the Aircraft or undertake any action to repossess or otherwise restrict or deny Manager's use and operation of the Aircraft in accordance with this Agreement, or (c) Customer is in default under any other agreement between Customer and Manager or any affiliate of Manager, which default permits Manager or such affiliate to terminate such agreement or seek other remedies thereunder.

11.5. <u>Amounts Owing</u>. If this Agreement is terminated early (a) by Manager for Customer's default hereunder or (b) by Customer (other than termination for Manager's default hereunder or as permitted in Section 11.1), Manager shall be entitled to receive from Customer all amounts accrued and owing by Customer to Manager hereunder. The exercise of any right of termination in accordance with Sections 11.1 through 11.6 shall be in

addition to all other rights and remedies available to the non-breaching party under this Agreement or at law and in equity, each of which shall be cumulative and not exclusive, except as otherwise expressly limited herein.

11.6. <u>Outstanding Liabilities</u>.   Each party shall remain liable for, and the termination of this Agreement shall not relieve either party of, its respective rights or obligations accrued under this Agreement prior to the effective date of such termination.   Manager shall have a lien upon and may retain possession of the Aircraft until all amounts due Manager under this Agreement have been paid in full.

11.7. <u>Custody of Aircraft</u>.   In the event of any termination of this Agreement, Manager shall cooperate reasonably with Customer and its affiliates, at Customer's expense, to transition the management of the Aircraft to a new Manager or return it to Customer.   In the event of any termination other than termination for Manager's default hereunder or under Section 11.1, Manager may at its option remove the Aircraft from any Manager hangar and otherwise park or store the Aircraft, for Customer's account and without further liability to Customer; <u>provided that</u> Customer shall be liable to and pay and reimburse Manager for reasonable parking and storage charges (as applicable) reasonably incurred by (or charged by) Manager in connection with the care and custody of the Aircraft.

## 12. Business Relationship

12.1. <u>Confidentiality</u>.   Each party will use commercially reasonable efforts to hold in confidence any information it may gain regarding the other's business.   Customer will not disclose any of Manager's reports, contracts, business terms, and manuals to any third party other than Customer's attorneys, accountants, advisors, or lenders with a need to know such information, <u>provided that</u> the recipients thereof will be advised of the confidential nature of such information.

12.2. <u>Independent Contractor</u>.   Manager is an independent contractor for all purposes under this Agreement, and neither party hereto, nor its agents or employees, shall be a partner, joint venturer, agent or employee of the other party.   Except as otherwise specifically provided herein, nothing in this Agreement shall authorize either party to bind the other to any contract or agreement.   Except as otherwise provided herein, all salaries, wages, payroll taxes, fringe benefits and Workers' Compensation payments applicable to Manager's employees and agents shall be the sole responsibility and cost of Manager.

## 13. Force Majeure

13.1 Neither party shall be in breach of its obligations hereunder or incur any liability to the other party or any other person for any cancellation, delay, interruption or prevention of completion of the transportation contracted for hereunder or failure to perform any act required under this Agreement arising in whole or in part from any of the following: (i) any unforeseen changes to laws, or regulations, any requirements, acts, omissions, demands or orders of any government or governmental authority, acts of God, sanctions (financial or otherwise), seizure under legal process, hijacking, riots, civil commotion, illness or injury, strikes or labor stoppage, fire, fog, flood, weather, inability to obtain fuel or essential parts, quarantines, epidemics, pandemics, requisitions of the Aircraft, military emergency, war,

rebellion, insurrections, hostilities or hazards or dangers incident thereto; (ii) damage or accident to or mechanical failures or breakdown of the Aircraft or any part thereof or any machinery or apparatus in connection therewith that was not directly due to either party's negligence, malfeasance or nonfeasance; (iii) negligence, malfeasance or nonfeasance by a person other than either party; or (iv) any other cause whatsoever, whether similar or dissimilar to the foregoing, that is beyond either party's control and not due to its negligence, malfeasance or nonfeasance.

## 14. **Liens**

14.1. Manager will ensure that no liens or encumbrances are created or placed against the Aircraft by third parties for claims against Manager, except (i) for mechanic's or supplier's liens for obligations not overdue and to be discharged in the normal course of business, (ii) those arising out of any failure of Customer to pay or reimburse Manager for any fees and expenses as required herein or (iii) those otherwise arising by operation of law and (a) are not the responsibility of the Manager or (b) if the responsibility of Manager, are discharged in the normal course of business ("Manager's Liens"). Manager will promptly discharge any Manager's Liens that may attach to the Aircraft from time to time.

## 15. **Miscellaneous**

15.1. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, exclusive of its choice of law provisions.

15.2. Jurisdiction. For any dispute hereunder that is not resolved by negotiation between the parties' representatives, the parties hereto consent to the jurisdiction and venue of the United States District Court for the Southern District of New York where the matter in controversy meets the jurisdictional threshold requisites, or the appropriate court of the State of New York, County of York, where federal jurisdiction is not satisfied.

15.3. Jury Waiver. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVE THEIR RIGHTS TO A JURY TRIAL IN ANY ACTION, SUIT, OR PROCEEDING RELATING TO, ARISING UNDER, OR IN CONNECTION WITH THIS AGREEMENT AND ANY OTHER DOCUMENT, AGREEMENT, OR INSTRUMENT EXECUTED AND DELIVERED IN CONNECTION WITH THE FOREGOING.

15.4. Severability. The invalidity or unenforceability of any term or provision of this Agreement shall not affect the validity or enforceability of any other term or provision hereof.

15.5. Attorneys' Fees. If any arbitration proceeding or legal action, including an action seeking injunctive relief as provided herein, is instituted by either party for the purpose of interpreting or enforcing any term or provision of this Agreement, the prevailing party in such action shall be entitled to recovery of reasonable attorneys' fees and expenses incurred in connection therewith, including investigative and expert fees and all other actual arbitration and court costs. The provisions of this Section will survive the termination or expiration of this Agreement.

15.6. <u>Addresses for Notices</u>.  Notification under this Agreement will be made by email, facsimile (with confirmation of transmission) or overnight delivery service to the addresses specified below (or such other address as may be provided to the other party in writing from time to time):

<blockquote>

If to Manager:      Eastern Airlines, LLC
                    550 East Swedesford Road, Suite 210
                    Wayne, PA 19087
                    Attn:  Ken Johnson
                    E-mail:  kjohnson@goeasternair.com


If to Customer:     2/25/94, LLC
                    One Patriot Place
                    Foxborough, MA 02035
                    Attn:  General Counsel
                    E-mail:  jimc@ifpcorp.com

</blockquote>

15.7. <u>Entire Agreement; Amendment</u>.  This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof.  This Agreement may be amended only by a written instrument duly executed by an authorized representative of the parties hereto or their respective permitted assigns.

15.8. <u>Non-Assignment</u>.  Neither Customer nor Manager may assign this Agreement, in whole or in part, without the prior written consent of the other, which will not be unreasonably withheld or delayed.

15.9. <u>Independent Advice</u>.  Each of the parties hereto represents to the other party that it has been represented by legal counsel in connection with the negotiation and execution of the Agreement.  In addition, each party represents that it has retained its own tax advisor and is not relying in any way on the other party for tax advice.

15.10. <u>Non-Waiver</u>.  The delay or omission in the exercise or enforcement of any right or remedy by either party shall not be construed as a waiver of such right or remedy.

15.11. <u>Section Headings</u>.  The section headings in this Agreement are inserted only for convenience and do not affect the interpretation hereof.

15.12. <u>Execution; Counterparts</u>.  A facsimile or electronically transmitted copy of an original signature to this Agreement shall be considered the same and effective as an executed original, and this Agreement may be executed in duplicate counterparts, each of which when fully signed shall constitute one and the same executed Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Aircraft Management Agreement to be executed and delivered by their respective, duly authorized representatives as of the day and year first above written.

**EASTERN AIRLINES, LLC, as Manager**          **2/25/94, LLC, as Customer**

By: _____          By: _____
Name: Steve Harfst                                           Name:
Title:  President & CEO                                     Title:

IN WITNESS WHEREOF, the parties hereto have caused this Aircraft Management Agreement to be executed and delivered by their respective, duly authorized representatives as of the day and year first above written.

**EASTERN AIRLINES, LLC, as Manager**          **2/25/94, LLC, as Customer**

By: _____          By: _____
Name:                                          Name: *JAMES NOLAN*
Title:                                          Title: *COO*

SCHEDULE A
To Aircraft Management Agreement


Aircraft Descriptions, Operating Base and Insured Hull Value


Airframe Manufacturer and Model:        Boeing 767-232ER
Airframe Serial Number:                 25193
Airframe Registration Mark:             N36NE
Engine Manufacturer and Model:          General Electric CF6-80C2
Engine Serial Numbers:                   690360 and 690368
Seating Configuration:                  205 seats
Lavatories:                             6
Maximum Landing Weight:                 _____ lbs.
Maximum Zero Fuel Weight:               _____ lbs.
Engine Thrust:                          _____ foot-pounds
Aircraft Operating Base:                KPVD
Aircraft Agreed Hull Insured Value:     $30,000,000.0



Airframe Manufacturer and Model:        Boeing 767-232ER
Airframe Serial Number:                 25194
Airframe Registration Mark:             N225NE
Engine Manufacturer and Model:          General Electric CF6-80C2
Engine Serial Numbers:                  690252 and 690321
Seating Configuration:                  240 seats after modification
Lavatories:                             6
Maximum Landing Weight:                 _____ lbs.
Maximum Zero Fuel Weight:               _____ lbs.
Engine Thrust:                          _____ foot-pounds
Aircraft Operating Base:                TBD
Aircraft Agreed Hull Insured Value:     $30,000,000

SCHEDULE B
to Aircraft Management Agreement

LISTING OF INITIAL GROUND SUPPORT EQUIPMENT

SCHEDULE C
to Aircraft Management Agreement

LISTING OF INITIAL SPARE PARTS PROVISIONING AND INVENTORIES