# Exhibit C

*Execution Version*

## PRIVATE CARRIAGE AGREEMENT (NEP)

THIS PRIVATE CARRIAGE AGREEMENT (NEP) (this "**Agreement**") is made and effective this *29* day of *JUNE*_____, 2020 by and between EASTERN AIRLINES, LLC, a Virginia limited liability company ("**Eastern**"), and NEW ENGLAND PATRIOTS LLC, a Delaware limited liability company (the "**Patriots**").

## WITNESSETH:

WHEREAS, Eastern is the holder of Air Carrier Certificate number 2DYA074Q issued by the Federal Aviation Administration (the "**FAA**") which authorizes Eastern to conduct carriage for hire in accordance with Part 121 of the Federal Aviation Regulations ("**FAR**" or "**FARs**"); and

WHEREAS, the FAR Part 121 Operations Specifications ("**OpSpecs**") issued to Eastern by the FAA permit FAR Part 121 operations with one or more Boeing model 767-323 aircraft; and

WHEREAS, pursuant to an Aircraft Dry Lease Agreement between them, Eastern has agreed to lease from 2/25/94 LLC (the "**Owner**") two Boeing model 767-323 aircraft bearing manufacturer's serial numbers 25193 and 25194 and U,S. registration marks N36NE and N225NE respectively (collectively the "**Aircraft**" and each an "**Aircraft**"); and

WHEREAS, the Owner and Eastern are parties to an Aircraft Management Agreement pursuant to which among other things Eastern will arrange for and supervise entry-into-service modifications of each Aircraft (the "**Management Agreement**"); and

WHEREAS, Aircraft N36NE (msn 25193) (the "**Primary Aircraft**") will be specially configured and equipped to accommodate V.I.P. executive passenger transportation and other persons with special travel requirements and will unless the Owner agrees otherwise be dedicated exclusively to the Patriots' and Owner's use; and

WHEREAS, the Patriots have a need for unique air transportation services that are not generally available in the air transportation marketplace;

NOW, THEREFORE, in consideration of the foregoing premises, and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the parties hereby agree as follows:

1.  Provision of Private Carriage and Scheduling.

    a.  Eastern hereby agrees to make the Primary Aircraft available to the Patriots and the Owner for transportation consisting of (i) all flights to transport the Patriots football team and/or associated personnel to and from all road pre-

season, regular season, and post season (playoff) games including without limitation the Super Bowl, and (ii) any other flights that include Patriots players, coaches, or associated personnel, as designated by Patriots executives beginning on or after the date the Aircraft is added to Eastern's OpSpecs (the "**Commencement Date**") and, unless sooner terminated, continuing through the conclusion of the term of this Agreement as set forth in Section 12.

    b.   The Patriots shall provide the pre-season and regular season schedule to Eastern within five Business Days (as defined in Section 18) of such schedule being released by the National Football League, upon the Effective Date of this Agreement, whichever occurs later. Within five Business Days of receipt of such schedule being delivered, Eastern shall propose a flight schedule to the Patriots, who shall review and approve such flight schedule within five Business Days. If the proposed flight schedule is not satisfactory to the Patriots, the parties shall resolve any scheduling issues by negotiation between authorized executives no later than ten Business Days prior to the first pre-season game, regardless of whether it is a home or away game. Patriots Flights are generally scheduled as follows (i) depart day before game and (ii) return day of game. The Patriots may alter the schedule as a result of a decision to remain in a particular geographic region for an extended duration (i.e. back-to-back west coast games) (an "**Extended Market Stay**").

2.  <u>Exclusive Use of the Primary Aircraft (N36NE); Non-Stop Service.</u>  Eastern acknowledges that unless the Owner agrees otherwise, the Patriots and Owner will be the exclusive users of the Primary Aircraft, and Eastern shall use commercially reasonable, good faith efforts to accommodate all the contemplated air travel needs of the Patriots during the term hereof. Each flight conducted for the Patriots hereunder shall be referred to as a "**Patriots Flight**" and collectively, the "**Patriots Flights**". Owner shall be entitled to schedule the use of the Primary Aircraft for other such flights as it may request ("**Other Owner Flights**"). Eastern may not substitute another aircraft for the Primary Aircraft without the prior approval of the Patriots unless the Primary Aircraft is otherwise unavailable because of circumstances beyond Eastern's control (e.g. entry-into-service modifications or other Owner- or Patriots-requested work, or an unscheduled or unplanned maintenance event). In the event of a permitted substitution, the substitute aircraft will be considered to be the "Primary Aircraft" for all purposes of this Agreement, but only for flights permitted hereunder. The Primary Aircraft will be qualified for world-wide operations, except for such jurisdictions where the operation of an aircraft would be in violation of the laws of the United States, or which would invalidate the policies of insurance in effect at the time of such Patriots Flight. All Patriots Flights or Other Owner Flights shall depart and return, nonstop (except for any unscheduled technical stops required to operate such flights), from/to T.F. Green Airport, Providence, Rhode Island (PVD), unless otherwise requested by the Patriots no less than 15 days in advance. In the event, technical stops are required for any requested flight segment, Eastern shall notify Patriots and Owner of such

requirements, and the expected impact on the proposed schedule.  Eastern shall coordinate and bear the cost of all required accommodations for Patriots or Owner during any technical stop.

3.  <u>Flights and Compensation; Taxes</u>.

   a.  The Patriots' Flights shall be provided to the Patriots at no charge, except that the Patriots shall pay for (i) the cost of fuel in excess of $2.50 per gallon (such base fuel price will escalate each year on the anniversary of the Commencement Date at the rate of the percentage increase in the Consumer Price Index For All Urban Consumers, U.S. City Average All Items (the "**CPI**"), as published by the U.S. Department of Labor, Bureau of Labor Statistics, for the previous twelve (12) month period) (**"Base Fuel Price"**) and (ii) the cost of in-flight catering, for which Eastern shall manage the into-plane logistics for all in-flight catering, and (iii) Excess Hours as defined below.

   b.  Patriots Flights shall not exceed 150 block hours in the first three years following the Commencement Date, and not exceed an average of 50 block hours per year, based on the Commencement Date, thereafter ("**Allotment Flight Hours**"), as calculated on a three year rolling average.  For each block hour in excess of the Allotment Flight Hours ("**Excess Hours**") the Patriots shall pay a fee of $25,000 ("**Excess Rate**") per Excess Hour.  However, to the extent that Patriots Flights exceed 50 block hours, in either the first or second year following the Commencement Date, such hours are deemed Excess Hours and the Patriots shall pay the Excess Rate for the Excess Hours incurred in each year at the conclusion of each year. At the end of the third year following the Commencement Date the Patriots and Eastern shall reconcile the actual Excess Hours against 150 total block hours for the first three years, and Eastern shall refund any amounts paid by the Patriots in excess of 50 block hours in either the first or second year following the Commencement Date for any hours that do not collectively exceed 150 total block hours over the preceding three year period. Based on such reconciliation, Patriots shall pay a fee of $25,000 for each incremental hour over 150 total block hours not paid following the first or second year following the Commencement Date.  Following the third anniversary of the Commencement Date, Excess Hours shall be calculated based upon a three year rolling average. Any Excess Hours paid for by the Patriots shall be removed from the calculation of the rolling average.

   c.  Other Owner Flights shall be provided to the Owner at Eastern's direct variable costs to conduct such flights (including, without limitation, travel and incidental costs for crew and fuel), plus 15%. All such Other Owner Flights shall be excluded from the Allotment Flight Hours and related calculation set forth in the preceding Section 3a.

d. <u>Excise Taxes</u>. To the extent that any of the services performed under this Agreement or the Management Agreement (the **"Services"**) or any other Service fees or expenses paid to Eastern, or paid to any third party vendor directly, or otherwise paid pursuant to the terms of this Agreement or the Management Agreement shall be taxable under the Federal Transportation Excise Tax, the Patriots shall, (i) if Eastern has the obligation to collect and remit such tax, remit the amount of such tax to Eastern for payment, or (ii) if the Patriots are obligated to pay such tax directly, directly pay the same to the Internal Revenue Service. The Patriots understand and agree that any determination (by Eastern, the Patriots, Owner or the Internal Revenue Service) concerning applicability of Federal Transportation Excise Taxes may be made during the term of this Agreement, or subsequent to the termination hereof, and during any applicable statute of limitations period (as such period may be extended, if applicable). The Patriots and Owner hereby jointly and severally agree to indemnify and hold Eastern harmless from and against any such Federal Transportation Excise Taxes, interest and penalties related thereto. The provisions of this Section 3d shall survive the expiration or other termination of this Agreement.

4. <u>Flight Crew</u>.

a. Eastern shall provide a sufficient number of fully qualified and properly certified flight crew for the Aircraft, including an appropriate number of cabin attendants to be agreed by Eastern and the Patriots (collectively, the **"Crew"**).

b. Any Crew members provided by Eastern to conduct flights with the Aircraft hereunder shall be employees or contractors of Eastern and are authorized to take orders only from Eastern. The Crew provided by Eastern shall exercise all of its duties and responsibilities with respect to each flight conducted hereunder in accordance with all applicable laws and regulations. The pilot-in-command shall have complete and absolute discretion concerning preparation of the Aircraft for flight, the load carried and its stowage and distribution, whether or not a flight shall be undertaken, the route to be flown, whether and where landings shall be made, and all other matters relating to the operation of the Aircraft, and the Patriots shall accept all such decisions as final. The pilot-in-command may in his sole discretion, terminate any flight, refuse to commence any flight or take any other action, which in the judgment of the pilot-in-command is necessitated by considerations of safety. No such termination of a flight, refusal to commence a flight, or other action by the pilot-in-command or any other member of the flight crew shall result in any liability for loss, injury, damage, delay or otherwise to the Patriots or any other person. Eastern shall have operational control (as defined in Section 1.1 of the FARs) of all Patriots Flights, and Eastern shall have all liability, civil or otherwise, relating to the operation of any Patriots Flight.

c. The Crew and the Primary Aircraft shall be at the designated departure location for any Patriots Flight at least 24 hours in advance of the scheduled departure time. The Crew and Aircraft will remain in the designated market for duration of stay in the designated market. If any Patriots Flights result in an Extended Market Stay, then at the discretion of the Patriots, provided in writing, the Crew may return to its/their home base(s), provided the crew availability requirements set forth above are satisfied.

d. Manager shall use commercially reasonable efforts so that the cabin crew remains consistent through the season. All cabin crew staffed to serve all Patriots Flights will be qualified and trained in order to provide service consistent with Patriots' and Owner's premium service standards. Subject to the foregoing, Manager shall use commercially reasonable efforts to maintain standardized cabin crew position within the cabin so that service levels are consistently maintained.

e. If Eastern has hired John Gaff ("**Gaff**"), Gaff shall serve as liaison (charter coordinator) between Eastern, Owner, and the Patriots.

5. Passengers.

a. At least 24 hours prior to departure of a Patriots Flight, the Patriots shall furnish to Eastern an anticipated manifest, in a mutually agreeable form, of the passengers to be carried on that flight. The Patriots shall provide Eastern with an updated manifest, as necessary, upon completion of the check-in process for such flight. Such manifest shall not list a number of passengers that exceeds the passenger capacity of the relevant Aircraft. The failure to include any passenger on the anticipated manifest, shall not be the basis for denial of boarding of such passenger, unless boarding would cause passenger capacity to be exceeded.

b. Eastern shall comply with the Private Charter Standard Security Program promulgated by the U.S. Transportation Security Administration, as well as any other applicable security rules and regulations (the "**Security Program**"). Eastern shall use its best efforts to obtain authority from the Transportation Security Administration to only conduct comprehensive security screening on 10% of the members of the Patriots who routinely travel on the Aircraft. The Patriots acknowledge and agree that all passengers on the Aircraft shall (i) possess a valid photo identification (such as a valid driver's license compliant with REAL ID), and (ii) be subject to search of their person and search or inspection of their property, including checked baggage, in accordance with security screening procedures, in order to ensure the safety and security of any flight hereunder. Eastern may refuse to transport any person who does not comply with the Security Program. Eastern may refuse to transport and may remove any passenger if, in the reasonable judgment of Eastern, such refusal or removal is necessary for the reasonable safety and comfort of the

other passengers or the flight crew, as a result of such passenger creating an unusual hazard or risk to himself or other person or to property, or in order to comply with applicable laws and regulations.

c.  The Patriots recognize that passengers' personal information will be given to Eastern for the purposes of arranging the passengers' carriage hereunder, obtaining any ancillary services, and making available such information to government agencies.  For these purposes, on behalf of itself and the passengers, the Patriots authorize Eastern to retain such information and to transmit it to its own offices, and upon consent of the Patriots and Owner to other carriers, or the providers of such services, wherever they may be located as provided under the Non-Disclosure Agreement dated June 5, 2019 between the Owner and Eastern.

d.  The Patriots shall comply and shall use reasonable efforts to facilitate compliance by all passengers on any Patriots Flight with all applicable laws and regulations including, but not limited to, those relating to illegal or controlled substances.  The Patriots shall not permit any passenger on a Patriots Flight to perform any illegal act that might result in the seizure of the Aircraft by any governmental agency, entity or person.  The Patriots agree that all passengers on any Patriots Flight shall act in a manner that is consistent with the FARs and any other applicable laws and regulations.

e.  Eastern will apply for Identity Based Screening (IBS) under the DHS Private Charter Standard Security Program (PCSSP) as the screening method for a contracted series of Patriots Flights with Eastern.  The TSA will require Eastern to submit a master schedule of contracted flights, along with a master manifest of individuals that are to travel regularly on a series of contracted flights; these are "known individuals."  The master manifest must include each passenger's full legal name, date of birth, gender, nationality, residence, passport number and passport expiration date.  (Note: An individual who is not expected to travel regularly on the contracted series of flights will not be considered a "known passenger" and will not be placed on the master manifest.)  In addition, the TSA will require a copy of the signed Private Carriage Agreement between Eastern and the Patriots.  In order to qualify for the IBS program, the contract or an addendum must set forth the contracted series of flights proving a minimum of three charters which must be fulfilled within a six-month period.  Once the TSA has approved the required documentation, pre-flight, private screening will be conducted in accordance with the IBS at a minimum of 25% of passenger counts or lesser amount as allowed by federal regulations in effect at that time.  Passengers to be screened will be randomly selected and unknown prior to screening commencement.

6.  <u>Maintenance and Hot Spare</u>.

    a.  Eastern shall maintain, inspect, service and repair the Aircraft in accordance with the FAA-approved Part 121 maintenance program for the Aircraft. No period of maintenance, preventive maintenance or inspection shall be postponed for purposes of scheduling the Aircraft for use under this Agreement unless such maintenance or inspection can be safely conducted at a later time in compliance with all applicable laws and regulations. Eastern shall use commercially reasonable, good faith efforts to maintain, inspect, service and repair the Aircraft pursuant to a schedule that does not conflict with any Patriots Flight.

    b.  Notwithstanding anything in this Agreement to the contrary, Eastern shall maintain and have ready at all times during scheduled Patriots Flight at Eastern's cost, a standby Aircraft to complete any Patriots Flight in the event that the Primary Aircraft is for any reason whatsoever unable to operate for a Patriots Flight (the "**Hot Spare**"). The Hot Spare will be fueled, crewed and ready to go from a pre-determined location to mobilize to the then current location of the Aircraft to complete the scheduled Patriots Flights should the Primary Aircraft become unable to complete any Patriots Flight. The 767 Aircraft bearing manufacturer's serial number 25194 ("**Aircraft 25194**") shall be the principal Hot Spare. The Hot Spare (or the alternative spare) shall be available at no additional cost to Owner or the Patriots. In the event MSN 25194 is unavailable, Eastern shall use commercially reasonable, good faith efforts to furnish another comparable 767-323 on its Part 121 Operations Specifications or obtained from a third-party provider holding similar certifications and insurance coverage to Eastern.

7.  <u>Approvals and Permits</u>. Eastern's obligation to operate any flight under this Agreement is contingent upon and subject to the timely issuance of all such approvals, clearances, permits and/or operating authority as may be required for the operation of each such flight, including, without limitation, all required landing, transit, and overflight rights. Eastern shall be responsible for procuring any such approvals, clearances, permits and operating authority in a timely manner in advance of each Patriots Flight in order for the Patriots Flight to be completed using the Primary Aircraft. In respect of flights or any portion thereof having a destination outside the contiguous United States or Hawaii, if after obtaining any such approvals, clearances, permits and operating authority, the applicable authority revokes or rescinds the same after issuance, or such authority fails or refuses to issue the same, provided that such failure, refusal, revocation or rescission is not a result of the fault or neglect of Eastern, Eastern shall be relieved of the obligation to provide such flight hereunder.

8.  <u>Force Majeure</u>. Eastern shall not be in breach of its obligations hereunder or incur any liability to the Patriots or any other person for any cancellation, delay, interruption or prevention of completion of the transportation contracted for

hereunder or failure to perform any act required under this Agreement arising in whole or in part from any of the following: (i) any unforeseen changes to laws or regulations, any requirements, acts, omissions, demands or orders of any government or governmental authority, acts of God, sanctions (financial or otherwise), seizure under legal process, hijacking, riots, civil commotion, illness, epidemic, pandemic or injury, strikes or labor stoppage, fire, fog, flood, weather, inability to obtain fuel or essential parts, quarantines, requisitions of the Aircraft, military emergency, war, rebellion, insurrections, hostilities or hazards or dangers incident thereto; (ii) damage or accident to or mechanical failures or breakdown of the Aircraft or any part thereof or any machinery or apparatus in connection therewith that was not directly due to Eastern's negligence, malfeasance or nonfeasance; (iii) negligence, malfeasance or nonfeasance by a person other than Eastern; or (iv) any other cause whatsoever, whether similar or dissimilar to the foregoing, that is beyond Eastern's control and not due to its negligence, malfeasance or nonfeasance.

9. <u>Limitations on Passengers</u>. All flights under this Agreement shall be flights operated by Eastern under FAR Part 121 as single entity charters solely for the Patriots or the Owner, and their respective guests. The Patriots covenant and agree that the Patriots alone will be responsible for payment of all amounts due to Eastern under this Private Carriage Agreement, and that no passenger on any flight conducted under this Agreement shall be charged in any way, either directly or indirectly, for such flight.

10. <u>Liability</u>.

    a. The liability of Eastern for bodily injury to or death of any passenger in connection with any Patriots Flight, and Eastern's liability for loss of or damage to any property (including, without limitation, baggage and personal effects) in connection with any Patriots Flight, shall be limited to the amount recoverable under the aircraft insurance maintained by Eastern or the limitation provided by applicable law, whichever is less; provided, however, that such limitation to insurance recovery shall not apply to limit Eastern's liability in the event that either (i) Eastern shall fail to procure the Insurance Coverages (as defined in Section 10b) required to be maintained hereunder in circumstances other than such Insurance Coverages are not available in the marketplace, or (ii) such Insurance Coverages fail to remain in full force and effect due to Eastern's breach of Section 10d below. Notwithstanding the foregoing, Eastern will not be responsible or have liability for injury or loss resulting from the theft or loss of, or damage to, valuables included in passenger baggage, including, but not limited to, money, negotiable papers, securities, vital medicines, jewelry, silverware, precious metals, cameras, lenses, radios, electronic equipment or other similar valuables so long as such injury or loss is not caused by the gross negligence, malfeasance or willful misconduct of employees or agents of Eastern.

b.  Eastern agrees to provide and maintain in full force and effect, at no expense to Patriots, insurance coverages as agreed in the Management Agreement (collectively, the "**Insurance Coverages**") relating to the Aircraft through the term hereof, such Insurance Coverages to include the types and limits of insurance coverage that operators of similar sized aircraft, being used for similar purposes, would carry, all of which are subject to the reasonable approval of the Patriots, but in no event less that the amount specified in the Management Agreement. Eastern shall cause an insurance certificate (the "**Insurance Certificate**") (i) naming Owner, the Patriots, Kraft Group LLC and each of their respective subsidiaries and affiliates and their members, managers, officers, employees, licensees and agents as additional insureds, and (ii) naming Owner as the sole loss payee on the hull insurance, and (iii) evidencing the coverages set forth in the immediately preceding sentence, to be delivered to the Patriots no later than five Business Days (as defined in Section 18) prior to the commencement of the first of the Patriots Flights and thereafter not later than five Business Days prior to each policy renewal date.

c.  The Patriots agree to reimburse Eastern, upon demand, based on replacement cost, for any and all damage to the Aircraft, including without limitation the interior, furniture, fixtures, entertainment or communications systems, caused by the Patriots or any passenger during any Patriots Flight, normal wear and tear excepted.

d.  Eastern shall not breach or violate any of the provisions of the Insurance Coverages nor operate the Aircraft in a manner, at a time or in or over or at a place where such Insurance Coverages are not in effect.

11. Term.  This Agreement shall commence on the date set forth above and unless sooner terminated in accordance with the provisions of Section 12 hereof, shall terminate upon termination of the Management Agreement.

12. Termination.

a.  This Agreement may be terminated by the Patriots immediately on written notice to Eastern if any of the following shall have occurred and be continuing as of the date such notice is received:

i.  Eastern fails to cause at least one of the Primary Aircraft and Aircraft 25194 to be included on its Part 121 Operations Specifications before the first Patriots Flight;

ii.  Eastern fails to operate any Patriots Flight when scheduled, so as to not deliver the Patriots team members listed on the approved manifest for such flight in to the market on the day of arrival originally scheduled, except in an event of Force Majeure;

iii. the cancellation, surrender, suspension or revocation of Eastern's Part 121 Certificate by the FAA or any other enforcement action that actually prevents Eastern from performing its obligations hereunder;

iv. Eastern shall be in material breach of its obligations to the Patriots or Owner under the Transaction Documents and such breach shall not have been cured within the time therein provided for cure;

v.  Eastern breaches its obligations under Section 10a or Section 10d;

vi. if, at any time, the FAA, a court, governmental agency or other authority having jurisdiction determines on a final non-appealable basis that Eastern operated the Aircraft in material violation of any Insurance Coverages or any law, regulation, directive or order of the FAA, the Department of Transportation, a court, governmental agency or other authority having jurisdiction;

vii. the Aircraft is not compliant in all material respects with Part 121 of the FARs at any time during the term of this Agreement (unless such non-compliance is caused by (1) a loss event without fault of Eastern, or (2) scheduled maintenance, or (3) unscheduled maintenance so long as Eastern is diligently pursuing the same, and Eastern timely supplies a substitute aircraft hereunder), or is no longer listed on Eastern's Part 121 Operations Specifications;

viii. Eastern fails to cause the Aircraft to be used, operated maintained or otherwise kept in a condition that complies in all material respects with Part 121 of the FARs and/or other applicable laws (except in the circumstances set forth in vi above);

ix. The occurrence of (i) a total loss or destruction of either the Primary Aircraft or Aircraft 25194, (ii) material damage to the Primary Aircraft or Aircraft 25194 which causes it, in the sole opinion of Owner, to be irreparable, or (iii) theft of the Primary Aircraft, and Eastern is unable to provide a replacement aircraft that is reasonably satisfactory to the Patriots (provided that Aircraft 25194 shall be deemed to be satisfactory if Eastern is able to provide a similarly configured hot-spare);

x. Eastern makes a general assignment for the benefit of its creditors, or commences a proceeding for relief for itself under any bankruptcy, insolvency or other similar law, or a voluntary proceeding is commenced seeking its liquidation or reorganization or appointing a receiver or liquidator for all or any substantial part of its assets;

xi. A proceeding shall have been instituted in a court having jurisdiction in the premises, seeking a decree or order (i) for relief in respect of Eastern

in an involuntary case under any applicable bankruptcy, reorganization, insolvency or other similar law now or hereafter in effect or (ii) for the appointment of a custodian, receiver, trustee or similar official of Eastern or of the property of Eastern, or (iii) for the winding up or liquidation of the affairs of Eastern, and either (I) any such proceeding shall remain un- dismissed or un-stayed and in effect for a period of 60 consecutive days or (II) such court shall enter a decree or order granting the relief sought in such proceeding or Eastern shall consent to such entry;

xii. The Primary Aircraft or any other aircraft operated by Eastern (or any of its affiliates) is involved in any accident resulting in serious injury to or death of any person, or Eastern (or any of its affiliates), within a twelve month period, is involved in two or more accidents reportable to the FAA or the National Transportation Safety Board under its rules and regulations, but in either case only if it is determined that Eastern (or such affiliate) was at fault with respect to any such accident.

b.  This Agreement may be terminated upon written notice by either party if (i) the other party hereto breaches any material term or condition hereof, other than any listed in Section 12a, and such breach is not cured within ten (10) Business Days after the breaching party receives written notice thereof from the other party, or (ii) in the case of a default by the other party or its affiliate under any other agreement between them or their affiliate, such default has not been cured within the time prescribed therein and such other agreement has been terminated; and

c.  This Agreement may be terminated upon written notice by Eastern if the Patriots fails to pay all amounts past due hereunder within ten Business Days following receipt of written notice from Eastern that such amount was not paid when due.

d.  Upon termination of this Agreement pursuant to Section 12a-c, each party shall have and may exercise all of the remedies available to it at law or in equity.

13. Waivers.  Any waiver, whether oral or in writing, express or implied, by either party of any failure by the other party in the observance and performance of any of the terms, conditions, obligations, responsibilities, or duties set forth in this Agreement shall not constitute or be construed as a waiver of any subsequent or other failure.

14. Governing Law; Severability; Venue.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York without regard to its choice of law rules.  If any provision of this Agreement conflicts with any such statute or rule of law of the State of New York, or is otherwise unenforceable, such provision shall be deemed null and void only the extent of such conflict or unenforceability, and shall be deemed separate from and shall not invalidate any

other provision of this Agreement. The parties hereby (a) agree that any legal action or proceeding with respect to this Agreement shall be brought in any state or federal court located in the Southern District of New York; (b) irrevocably consent and submit to the exclusive jurisdiction of all such courts and waive any objections that they may now or hereafter have to the venue of any suit, action or proceeding brought in these courts; and (c) further irrevocably waive any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

15. <u>Amendment.</u>  This Agreement may not be amended, supplemented, modified or terminated, or any of its terms varied, except by an agreement in writing signed by each of the parties hereto.

16. <u>Counterparts.</u>  This Agreement may be executed in counterparts, each of which shall for all purposes be deemed an original and all such counterparts, taken together, shall constitute one and the same agreement, even though all parties may not have executed the same counterpart. Each party may transmit its signature by Portable Document Format (PDF) attachment to e-mail, and any such signature page shall have the same force and effect as a manually signed original signature page.

17. <u>Successors and Assigns.</u>  This Agreement shall be binding upon the parties hereto, and their respective successors and assigns, and shall inure to the benefit of the parties hereto, and, except as otherwise provided herein, to their respective successors and permitted assigns. Neither party shall have the right to sublease, assign, transfer, pledge, or delegate, this Agreement or any part hereof without the prior written consent of the other party.

18. <u>Notices.</u>  Unless otherwise expressly specified or permitted by the terms hereof, all notices, requests, demands, authorizations, directions, consents, waivers or documents provided or permitted by this Agreement to be made, given, furnished or filed shall be in writing, personally delivered or delivered by a nationally utilized overnight delivery service on a priority basis, or by confirmed PDF attachment to e-mail, and addressed to such address as set forth under such party's signature hereto. Each party agrees at the request of the other party to promptly confirm (which may be via e-mail) its receipt of any notice or communication sent by PDF. Any party hereto may change the address to which notices to such party will be sent by giving notice of such change to the other parties to this Agreement. Notices shall be deemed to have been received on the Business Day on which hand-delivered, one Business Day after the date on which sent by nationally utilized overnight delivery service on a priority basis, or on the Business Day on which sent by confirmed PDF attachment to e-mail. Notices received after 5:00 pm at the recipient's location or on a day that is not a Business Day shall be deemed to have been received on the next succeeding Business Day. For purposes of this Agreement, a "Business Day" means any day other than a Saturday, a Sunday, a legal holiday in the State of New York or a day on which the Federal Reserve Bank of New York is closed. Notwithstanding the foregoing, routine communications may be in such form as the parties may agree.

19. <u>Entire Agreement</u>.  This Agreement sets forth the entire understanding between the parties hereto, and supersedes all previous communications, representations or agreements, whether oral or written, between the parties, with respect to the subject matter hereof.

[SIGNATURE PAGE FOLLOWS]

SIGNATURE PAGE FOR PRIVATE CARRIAGE AGREEMENT (NEP)

IN WITNESS WHEREOF, Eastern and the Patriots have executed this Private Carriage Agreement (NEP) on the date first above written.

EASTERN AIRLINES, INC.

By: _____
Name: Steve Harfst
Title: President & CEO



Address for Notice:

Eastern Airlines, LLC
Attn: Ken Johnson
550 Swedesford Road, Suite #210
Wayne, PA 19087
E-mail: kjohnson@goeasternair.com

NEW ENGLAND PATRIOTS LLC
By: Kraft Patriots LLC, Its Managing Member
By: Kraft Enterprises LLC, Its Managing Member
By: Kraft Patriots Inc., Its Member


By: _____
Name:
Title:



Address for Notice:

New England Patriots LLC
Attn: James J. Nolan, Jr.
Gillette Stadium
One Patriot Place
Foxborough, MA 02035
Telephone: 508-384-9120
E-mail: jimn@kraftse.com

SIGNATURE PAGE FOR PRIVATE CARRIAGE AGREEMENT (NEP)

IN WITNESS WHEREOF, Eastern and the Patriots have executed this Private Carriage Agreement (NEP) on the date first above written.

EASTERN AIRLINES, INC.                    NEW ENGLAND PATRIOTS LLC


By:_____               By:_____
Name:                                    Name: JAMES NOLAN
Title:                                   Title: COO



Address for Notice:                      Address for Notice:

Eastern Airlines, LLC                    New England Patriots LLC
Attn: Ken Johnson                        Attn:  James J. Nolan, Jr.
550 Swedesford Road, Suite #210          Gillette Stadium
Wayne, PA 19087                          One Patriot Place
E-mail: kjohnson@goeasternair.com        Foxborough, MA 02035
                                         Telephone:  508-384-9120
                                         E-mail:  jimn@kraftse.com

**SCHEDULE 1**
**TO**
**PRIVATE CARRIAGE AGREEMENT (NEP)**
**FEES AND CERTAIN OTHER TERMS**

Eastern and the Patriots further agree as follows:

1.  <u>Aircraft Condition</u>. The Aircraft will be in the Delivery Condition as set forth in the Management Agreement.

2.  <u>Charges Included</u>. All flight related operating costs and charges, except as specifically noted in Section 3 of this Agreement.

3.  <u>Flight Operations</u>. Flight operations will be conducted in accordance with the following general principles:

    a.  Scheduled flights ("**Scheduled Operations**") will be defined as the origin of Providence, Rhode Island (PVD) on pre-season, regular and post-season flights.

    b.  Subject to reasonable notice and availability, the Patriots will be entitled to access the Aircraft for non-scheduled trips, including Other Owner Flights ("**Non-scheduled Operations**"). The Patriots shall not allow any Non-scheduled Operations to interfere with any Scheduled Operations.

4.  <u>International Flight Operations</u>. "**International Flight Operations**" are defined as any flight that originates at, or is destined, for, any airport outside the continental United States of America. International Flight Operations will be conducted in accordance with the following general principles:

    a.  The Patriots agree to participate in any reasonable government passenger program in cooperation with Eastern with a mutual goal to achieve the most efficient International Flight Operations. Examples of these programs include EAPIS passenger list 24 hours advance notice prior to any origin departure along with the U.S. Customs and Border Protection's Sentri and Global Entry System.

    b.  The Patriots agree that all passengers will be required to participate and cooperate by having in their possession a valid Passport for international travel, plus one additional form of photo identification that includes birth date.

    c.  Eastern agrees to use commercially reasonable efforts to (i) conduct each originating International Flight Operation on a non-stop basis, (ii) conduct each returning International Flight Operation either (a) with a technical stop to accomplish customs, catering, etc., at the most suitable airport or (b) non-stop back to the United States (airport TBD) subject to governmental limitations.